IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BACHITAR SINGH,

     Petitioner,

vs.                                                                                              No. CIV 25-1110 JB/KK

KRISTI NOEM, Secretary of Homeland
Security, PAMELA BONDI, U.S. Attorney
General, TODD M. LYONS, Acting Director of
Immigration and Customs Enforcement, MARY
DE ANDA-YBARRA, El Paso Field Office
Director, DORA CASTRO, Warden of the
Otero County Processing Center,

     Respondents.

## MEMORANDUM OPINION AND ORDER SUSTAINING THE OBJECTIONS TO THE MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** comes before the Court on: (i) the Respondents' Objections to the Proposed Findings and Recommended Disposition, filed December 4, 2025 (Doc. 18)("Objections to the TRO PFRD"); and (ii) the Respondents' Objections to the Proposed Findings and Recommended Disposition, filed January 13, 2026 ("Objections to the Habeas Petition PFRD"). The Honorable Kirtan Khalsa, United States Magistrate Judge for the United States District Court for the District of New Mexico, files two documents: (i) the Magistrate Judge's Proposed Findings and Recommended Disposition, filed November 21, 2025 (Doc. 14)("TRO PFRD"); (ii) the Magistrate Judge's Proposed Findings and Recommended Disposition, filed December 31, 2025

---

[1] Because Singh files for a TRO, the Court is concerned about being a good judge and giving a timely ruling, while also learning a new body of law. The Court had the Court's Courtroom Deputy Clerk ("CRD") call Singh's counsel to find out how long it had to rule on Singh's motion for a TRO and still be a good judge. Singh's counsel referenced Singh's Final Preliminary Hearing at 1:30 p.m. on January 20, 2025.  Using this as a deadline, the Court has worked to get out its opinion by this date.

(Doc. 20)("Habeas Petition PFRD").  Both PFRDs notify the parties of their ability to file Objections within fourteen days and that the failure to file Objections waives appellate review. See TRO PFRD at 22; Habeas Petition PFRD at 14.  On December 4, 2025, the Respondents -- Kristi Noem, Secretary of Homeland Security, Pamela Bondi, United States Attorney General, Todd M. Lyons, Acting Director of Immigration and Customs Enforcement, and Mary De Anda-Ybarra, El Paso Field Office Director of ICE, collectively "the Federal Respondents"[2] -- file their Objections to the TRO PFRD. See Objections to the TRO PFRD at 1. On December 18, 2025, Petitioner Bachitar Singh files a Response to the Respondents' Objections to the Magistrate's Proposed Findings and Recommended Disposition, filed December 18, 2025 (Doc. 19)("Response").  On December 31, 2025, Magistrate Judge Khalsa files the Habeas Petition PFRD.  Habeas Petition PFRD at 1.  On January 13, 2026, the Federal Respondents' file their Objections to the Habeas Petition PFRD.  The primary issues that the TRO PFRD Objections present are: (i) whether Singh is subject to mandatory detention under 8 U.S.C. § 1225(b)(2), because he is an alien present within the United States without having been lawfully admitted, or instead is subject to detention under 8 U.S.C. § 1226(a); (ii) whether Singh must be released, or in the alternative, a bond hearing must be afforded; (iii) whether, if a bond hearing is granted, the burden should be on the United States of America to prove by clear-and-convincing evidence that circumstances have changed such that Singh is now a flight risk or a danger to persons or property; (iv) whether the United States violates Singh's due process rights because of his detention under 8 U.S.C. § 1225 without bond; and (v) whether Singh may file a motion for attorney's fees under

---

[2] Dora Castro, the Warden of the Otero County Processing Center, does not work for the federal government, and the attorneys working for the United States government who file the Objections to the PFRD do not represent Castro.  Castro has indicated, however, that Castro adopts all of the Federal Respondents' positions and argument in these habeas cases.

the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)("EAJA").   The Court concludes that: (i) while Singh is a candidate for mandatory detention under 8 U.S.C. § 1225(b)(1), because he is an applicant for admission who has been present in the United States for less than two continuous years before the date of determination of inadmissibility, the immigration officer who screened Singh on September 4, 2025 did not determine that Singh is inadmissible under 8 U.S.C. § 1182(a)(6)(c) or 8 U.S.C. § 1182(a)(7), as § 1225(b)(1)(a)(i) requires; (ii) the United States properly holds Singh under § 1225(b)(2), because he is an applicant for admission who is present in the United States, is not lawfully admitted, is seeking admission, and the immigration officer has determined that he is not entitled to be admitted; (iii) the United States has not violated Singh's due process rights, because the length of Singh's detention to date does not violate procedural or substantive due process;  (iii) the Court does not decide who carries the burden of proof and what that burden is in an 8 U.S.C. § 1226 bond hearing, because Singh is not entitled to a bond hearing under § 1226; and (iv) Singh may not file a motion for fees under the EAJA because he is not the prevailing party.

## FACTUAL BACKGROUND

No party objects to the PFRD's factual background.  Finding that the facts as stated, therefore, are not clearly erroneous, the Court adopts the PFRD's facts.  See Alexander v. Kirkpatrick, 435 F. Supp. 3d 1216, 1221-22 (D.N.M. 2020)(Browning, J.)("Because the parties have not objected to it, the Court does not review the PFRD de novo, but rather reviews [the PFRD] to determine if it is clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion.").

Singh is an Indian citizen who enters the United States without inspection on or about September 15, 2023.  See PFRD at 2.  Singh does not cross the border at a port of entry, but crosses

at an unauthorized location, and immigration officials in Lukeville, Arizona detain him shortly

after he enters.  See Notice to Appear, dated September 16, 2023, filed November 7, 2025 (Doc.

1)("Notice").  Shortly after his arrival, United States immigration officials  in Yuma, Arizona,

detain Singh.  See PFRD at 2.  The following day, immigration officials serve him with the Notice

to appear before an Immigration Judge, charging that he is inadmissible, because he is present in

the United States without being admitted or paroled.  See PFRD at 2.  The Notice is pursuant to

the removal proceedings under section 236 of the Immigration and Nationality Act ("INA"), 8

U.S.C. § 1226.  In three places, the Notice states that Singh is not admitted or paroled.  See, e.g.,

Notice at 1 ("You are an alien present in the United States who has not been admitted or paroled.");

id. ("You were not then admitted or paroled after inspection by an Immigration Officer.").  The

Notice then says:

> On the basis of the foregoing, it is charged that you are subject to removal from the
> United States pursuant to the following provision(s) of law:
>
> 212(a)(6)(A)(i) [8 U.S.C. § 1182(a)(6)(A)(i)] of the Immigration and Nationality
> Act, as amended, in that you are an alien present in the United States at any time or
> place other than as designated by the Attorney General.

Notice at 1.  The Notice orders Singh to appear before an immigration judge in San Francisco,

California on April 2, 2026.  See Notice at 1.  That same day, on September 16, 2023, the United

States Department of Homeland Security ("DHS") release Singh on his own recognizance, in

accordance with section 236 of the Immigration and Nationality Act, 8 U.S.C. § 1226.  See PFRD

at 2.  The Order of Release on Recognizance states: "You have been arrested and placed in removal

proceedings."  See Order of Release on Recognizance, dated September 16, 2023, filed November

7, 2025 (Doc. 1)("Order of Release").  The Order of Release states: "In accordance with section

236 of the Immigration and Nationality Act [8 U.S.C. § 1226], Singh is released on his own

recognizance  provided  that  he  complies  with  certain  conditions.  One  condition  is  that

"Employment not authorized."  Order of Release at 1.  Singh has resided in the United States since his release.  See PFRD at 2.  He has no criminal history and has complied fully with all of the conditions of his release.  See PFRD at 2.  On March 19, 2024, Singh timely files an application for asylum, withholding of removal, and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.  See PFRD at 2.  Effective September 17, 2024, the United States grants Singh an Employment Authorization valid until September 16, 2029.  See PFRD at 2.  Singh subsequently obtains a commercial driver's license and employment as a commercial truck driver.  See PFRD at 2.

On or about September 4, 2025, while he is employed driving a commercial vehicle, Singh travels through a United States Border Patrol checkpoint in New Mexico.  See PFRD at 2.  At the checkpoint, immigration official Oscar Delgado re-detains Singh, despite the absence of any material change in circumstances that would have rendered him a danger to the community or flight risk.  See PFRD at 2-3.  At this second encounter, on September 4, 2025, Singh is encountered north of Las Cruces, at the United States Border Patrol Checkpoint on I-25.  See Record of Deportable/Inadmissible Alien, at 2, dated September 7, filed November 28, 2025 (Doc. 16).  Officer Delgado questions Singh about his citizenship.  See Record of Deportable/Inadmissible Alien at 2.  Singh states that he is from India and provides a valid Employment Authorization Document.  See Record of Deportable/Inadmissible Alien at 2. Delgado asks Singh how he enters the United States, and Singh replies that he enters illegally through Arizona and that the United States Border Patrol Agents apprehends him in 2023.  See Record of Deportable/Inadmissible Alien at 2.  A record check reveals that a United States Border Patrol Apprehension occurs in Ajo, Arizona on September 15, 2023 for Entry Without Inspection. See Record of Deportable/Inadmissible Alien at 2.  Officer Delgado notes that Singh has a pending

EOIR[3] hearing on September 9, 2028, in California.  See Record of Deportable/Inadmissible Alien at 2.  Singh is transported to the El Paso Sector Centralized Processing Center for "custody redetermination."  See Record of Deportable/Inadmissible Alien at 2.

In an addendum, located at the bottom of page 2 of the Record of Deportable/Inadmissible Aliens, another immigration officer, Lorenzo Zuniga, states he advises Singh of his rights in the removal proceeding.  See Record of Deportable/Inadmissible Alien at 2.  Singh states that he is a citizen and national of India and has a pending court hearing.  See Record of Deportable/Inadmissible Alien at 2.  Agent Zuniga indicates on page 3 that "Singh is being served with a Notice to Appear . . ., and placed in removal proceedings, per section 212(a)(6)(A)(i) [8 U.S.C. §1182(a)(6)(A)(i)] of the INA."  Record of Deportable/Inadmissible Alien at 3.   Agent Zuniga states that Singh "has [a] pending court date of August 09, 2028."  See Record of Inadmissible Alien at 3.  In the disposition section, Agent Zuniga states that Singh was processed "on 09/07/2025 as per section 212(a)(6)(A)(i)(I)[4] of the Immigration and Nationality Act."  Record of Deportable/Inadmissible Alien at 3.  Agent Zuniga states that "Subject I-862 was updated with pending court date on 08/09/2028 in El Paso, TX."  Record of Deportable/Inadmissible Alien at 3.  Singh is then transferred to ICE/ERO[5] . . ."  Record of Deportable/Inadmissible Alien at 3.  The United States has held Singh without bond since that time and currently detains him at the Otero

---

[3] An EOIR hearing is conducted by immigration judges as part of the Executive Office for Immigration Review (EOIR).  Immigration Court, ICE Portal, https://portal.ice.gov/immigration-guide/court.

[4] The Court cannot find the subsection (I).

[5] ERO stands for Enforcement and Removal Operations, which "manages all aspects of the immigration enforcement process, including the identification, arrest, detention and removal of aliens who are subject to removal or are unlawfully present in the U.S."  Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, https://www.ice.gov/about-ice/ero.

County Processing Center in Chaparral, New Mexico.  See PFRD at 3.

Singh's asylum application remains pending.  See PFRD at 2.  Singh's next hearing is a Final Preliminary hearing, which is set for January 20, 2025.[6]  The Court's understanding is that this hearing is the equivalent of a court's pretrial conference before Singh has his final asylum hearing.

## LAW REGARDING OBJECTIONS TO PROPOSED FINDINGS AND RECOMMENDATIONS

District courts may refer dispositive motions to a Magistrate Judge for a recommended disposition.  See Fed. R. Civ. P. 72(b)(1) ("A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense. . . .").  Rule 72(b)(2) governs objections: "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Civ. P. 72(b)(2).  Finally, when resolving objections to a Magistrate Judge's proposal, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).  Similarly, 28 U.S.C. § 636 provides:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also

---

[6] On January 16, 2026, the Court's Courtroom Deputy Clerk called Singh's counsel about what the status of Singh's asylum proceedings are, and the date comes from Singh's counsel.  See 28 U.S.C. § 636(b)(1)(A)("A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence . . . .").

receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1).

"The filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- that are at the heart of the parties' dispute." United States v. One Parcel of Real Prop., With Bldgs., Appurtenances, Improvements, and Contents, 73 F.3d 1057, 1059 (10th Cir.1996)("One Parcel")(quoting Thomas v. Arn, 474 U.S. 140, 147 (1985)). As the United States Court of Appeals for the Tenth Circuit notes, "the filing of objections advances the interests that underlie the Magistrate's Act, including judicial efficiency." One Parcel, 73 F.3d at 1059 (citing Niehaus v. Kan. Bar Ass'n, 793 F.2d 1159, 1165 (10th Cir.1986); United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981)).

The Tenth Circuit holds "that a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." One Parcel, 73 F.3d at 1060. "To further advance the policies behind the Magistrate's Act, [the Tenth Circuit], like numerous other circuits, have adopted 'a firm waiver rule' that 'provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions.'" One Parcel, 73 F.3d at 1059. In addition to requiring specificity in objections, the Tenth Circuit states that "[i]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996). See United States v. Garfinkle, 261 F.3d 1030, 1031 (10th Cir. 2001)("In this circuit, theories raised for the first time in objections to the magistrate judge's report are deemed waived."). In an unpublished opinion, the Tenth Circuit states that "the district court correctly held that [a

petitioner] had waived [an] argument by failing to raise it before the magistrate." Pevehouse v. Scibana, 229 Fed. Appx. 795, 796 (10th Cir.2007).[7]

In One Parcel, the Tenth Circuit, in accord with other Courts of Appeals, expands the waiver rule to cover objections that are timely but too general. See One Parcel, 73 F.3d at 1060. The Supreme Court of the United States -- in the course of approving the United States Court of Appeals for the Sixth Circuit's use of the waiver rule -- notes:

> It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings. The House and Senate Reports accompanying the 1976 amendments do not expressly consider what sort of review the district court should perform when no party objects to the magistrate's report. *See* S.Rep. No. 94-625, pp. 9-10 (1976)(hereafter Senate Report); H.R.Rep. No. 94-1609, p. 11 (1976), U.S.Code Cong. & Admin. News 1976, p. 6162 (hereafter House Report). There is nothing in those Reports, however, that demonstrates an intent to require the district court to give any more consideration to the magistrate's report than the court considers appropriate. Moreover, the Subcommittee that drafted and held hearings on the 1976 amendments had before it the guidelines of the Administrative Office of the United States Courts concerning the efficient use of magistrates. Those guidelines recommended to the district courts that "[w]here a magistrate makes a finding or *ruling* on a motion or an issue, his determination should become that of the district court, unless specific objection is filed within a reasonable time." *See* Jurisdiction of United States Magistrates, Hearings on S.

---

[7]Pevehouse v. Scibana is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citing In re Citation of Unpublished Opinions/Orders & Judgments, 151 F.R.D. 470 (10th Cir. 1993)). The Court concludes that Pevehouse v. Scibana has persuasive value with respect to a material issue, and will assist the Court in its disposition of the matters now before it.

1283 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 24 (1975)(emphasis added)(hereafter Senate Hearings). The Committee also heard Judge Metzner of the Southern District of New York, the chairman of a Judicial Conference Committee on the administration of the magistrate system, testify that he personally followed that practice. *See id.,* at 11 ("If any objections come in, . . . I review [the record] and decide it. If no objections come in, I merely sign the magistrate's order."). The Judicial Conference of the United States, which supported the *de novo* standard of review eventually incorporated in § 636(b)(1)(C), opined that in most instances no party would object to the magistrate's recommendation, and the litigation would terminate with the judge's adoption of the magistrate's report. *See* Senate Hearings, at 35, 37. Congress apparently assumed, therefore, that any party who was dissatisfied for any reason with the magistrate's report would file objections, and those objections would trigger district court review. There is no indication that Congress, in enacting § 636(b)(1)(C), intended to require a district judge to review a magistrate's report to which no objections are filed. It did not preclude treating the failure to object as a procedural default, waiving the right to further consideration of any sort. We thus find nothing in the statute or the legislative history that convinces us that Congress intended to forbid a rule such as the one adopted by the Sixth Circuit.

Thomas v. Arn, 474 U.S. at 150-52 (emphasis in original).

The Tenth Circuit also notes, "however, that '[t]he waiver rule as a procedural bar need not be applied when the interests of justice so dictate.'" One Parcel, 73 F.3d at 1060 (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir.1991)("We join those circuits that have declined to apply the waiver rule to a pro se litigant's failure to object when the magistrate's order does not apprise the pro se litigant of the consequences of a failure to object to findings and recommendations."). Cf. Thomas v. Arn, 474 U.S. at 154 (noting that, while "[a]ny party that desires plenary consideration by the Article III judge of any issue need only ask," a failure to object "does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard"). In One Parcel, the Tenth Circuit notes that the district judge decides sua sponte to conduct a de novo review despite the objections' lack of specificity, but the Tenth Circuit deems the issues waived on appeal, because waiver advances the interests underlying the waiver rule. See 73 F.3d at 1060-61 (citing cases from other Courts of Appeals

where district courts elect to address merits despite potential application of waiver rule, but Courts of Appeals opt to enforce waiver rule).

Where a party files timely and specific objections to the Magistrate Judge's PFRD, on "dispositive motions, the statute calls for a *de novo* determination, not a *de novo* hearing." United States v. Raddatz, 447 U.S. 667, 674 (1980). "[I]n providing for a '*de novo* determination' rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate judge's proposed findings and recommendations." United States v. Raddatz, 447 U.S. at 676, (quoting 28 U.S.C. § 636(b) and citing Mathews v. Weber, 423 U.S. 261, 275 (1976)). The Tenth Circuit requires a "district court to consider relevant evidence of record and not merely review the magistrate judge's recommendation" when conducting a de novo review of a party's timely, specific objections to the magistrate judge's report. In re Griego, 64 F.3d 580, 583-84 (10th Cir. 1995). "When objections are made to the magistrate's factual findings based on conflicting testimony or evidence . . . the district court must, at a minimum, listen to a tape recording or read a transcript of the evidentiary hearing." Gee v. Estes, 829 F.2d 1005, 1008-09 (10th Cir. 1987).

A district court must "clearly indicate that it is conducting a de novo determination" when a party objects to the Magistrate Judge's report "based upon conflicting evidence or testimony." Gee v. Estes, 829 F.2d at 1009. On the other hand, a district court fails to meet the requirements of 28 U.S.C. § 636(b)(1) when it indicates that it gave "considerable  deference to the magistrate's order." Ocelot Oil Corp. v. Sparrow Indus., 847 F.2d 1458, 1464 (10th Cir. 1988). A district court need not, however, "make any specific findings; the district court must merely conduct a *de novo* review of the record." Garcia v. City of Albuquerque, 232 F.3d 760, 766 (10th Cir.2000). "[T]he district court is presumed to know that de novo review is required.  Consequently, a brief order

expressly stating the court conducted de novo review is sufficient." Northington v. Marin, 102 F.3d 1564, 1570 (10th Cir. 1996)(citing In re Griego, 64 F.3d at 583-84). "[E]xpress references to de novo review in its order must be taken to mean it properly considered the pertinent portions of the record, absent some clear indication otherwise." Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d 722, 724 (10th Cir. 1993). The Tenth Circuit holds that a district court properly conducts a de novo review of a party's evidentiary objections when the district court's "terse" order contains one sentence for each of the party's "substantive claims" and does "not mention his procedural challenges to the jurisdiction of the magistrate to hear the motion." Garcia v. City of Albuquerque, 232 F.3d at 766. The Tenth Circuit explains that brief district court orders that "merely repeat[ ] the language of § 636(b)(1) to indicate its compliance" are sufficient to demonstrate that the district court conducts a de novo review:

> It is common practice among district judges in this circuit to make such a statement and adopt the magistrate judges' recommended dispositions when they find that magistrate judges have dealt with the issues fully and accurately and that they could add little of value to that analysis. We cannot interpret the district court's statement as establishing that it failed to perform the required de novo review.

In re Griego, 64 F.3d at 584.

Notably, because "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations," United States v. Raddatz, 447 U.S. at 676 (emphasis omitted), a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," 28 U.S.C. § 636(b)(1). See Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d at 724-25 (holding that the district court's adoption of the Magistrate Judge's "particular reasonable-hour estimates" is consistent with the de novo determination that 28 U.S.C. § 636(b)(1) and United States v. Raddatz require).

Where no party objects to the Magistrate Judge's PFRD, the Court reviews, as a matter of course and in the interests of justice, the Magistrate Judge's recommendations.  In Pablo v. Soc. Sec. Admin., No. CIV 11-0132 JB/ACT, 2013 WL 1010401 (D.N.M. February 27, 2013)(Browning, J.), the plaintiff fails to respond to the Magistrate Judge's PFRD, and thus waives his right to appeal the recommendations, but the Court nevertheless conducts a review.  See 2013 WL 1010401, at *1, *4.  The Court generally does not, however, "review the PFRD de novo, because the parties have not objected thereto, but rather review[s] the recommendations to determine whether they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion." Pablo v. Soc. Sec. Admin., 2013 WL 1010401, at *4.  The Court, thus, does not determine independently what it would do if the issues had come before the Court first, when there is no objection, but rather adopts the PFRD where "'the Court cannot say that the Magistrate Judge's recommendation . . . is clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion.'"  Pablo v. Soc. Sec. Admin., 2013 WL 1010401, at *3 (quoting Workheiser v. City of Clovis, No. CIV 12–0485 JB/GBW, 2012 WL 6846401, at *3 (D.N.M. December 28, 2012)(Browning, J.).  See Alexandre v. Astrue, No. CIV 11-0384 JB/SMV, 2013 WL 1010439, at *4 (D.N.M. February 27, 2013)(Browning, J.)("The Court rather reviewed the findings and recommendations . . . to determine if they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion.  The Court determines that they are not, and will therefore adopt the PFRD."); Trujillo v. Soc. Sec. Admin., No. CIV 12-1125 JB/KBM, 2013 WL 1009050, at *5 (D.N.M. February 28, 2013)(Browning, J.)(adopting the proposed findings and conclusions, and noting: "The Court did not review the ARD de novo, because Trujillo has not objected to it, but rather reviewed the . . . findings and recommendation to determine if they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion, which they are not.").  This review,

which is deferential to the Magistrate Judge's work when there is no objection, nonetheless provides some review in the interest of justice, and seems more consistent with the waiver rule's intent than no review at all or a full-fledged review. Accordingly, the Court considers this standard of review appropriate. See Thomas v. Arn, 474 U.S. at 151 ("There is nothing in those Reports, however, that demonstrates an intent to require the district court to give any more consideration to the magistrate's report than the court considers appropriate."). The Court is reluctant to have no review at all if its name is going at the bottom of the order adopting the Magistrate Judge's PFRD.

## LAW REGARDING STATUTORY INTERPRETATION

When interpreting statutes, the Court must start with the plain language. See Been v. O.K. Industries, Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)("We review issues of statutory construction de novo, 'interpret[ing] the words of the statute in light of the purposes Congress sought to serve.'")(quoting Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233–34 (10th Cir.2006)). "It is well established that 'when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'" Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004)(quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6, (2000)). See In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 (1978)(noting that a court may not disregard the statute's plain language unless a literal application of the statutory language "'would lead to absurd results . . . or would thwart the obvious purpose of the statute'")(quoting Commissioner v. Brown, 380 U.S. 563, 571, (1965)). "Courts indulge 'a strong presumption that Congress expresses its intent through the language it chooses. Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it.'" United Kingdom Ministry of Defence v. Trimble Navigation Ltd., 422 F.3d 165, 171 (4th Cir.

2005)(quoting <u>Sigmon Coal Co. v. Apfel</u>, 226 F.3d 291, 305 (4th Cir.2000)).  <u>See</u> <u>Public Lands</u>

<u>Council v. Babbit</u>, 167 F.3d 1287, 1314 (10th Cir. 1999)(Seymour, C.J.)("In examining . . .

[statutory] language, we assume that the words chosen by Congress are employed in their ordinary

sense and accurately express Congress' [] legislative purpose.").

 "A statute is ambiguous when it is 'capable of being understood by reasonably well-

informed persons in two or more different senses.'" <u>United States v. Quarrell</u>, 310 F.3d 664, 669

(10th Cir. 2002)(quoting <u>In re Geneva Steel Co.</u>, 281 F.3d at 1178).  "The plainness or ambiguity

of statutory language is determined by the reference to the language itself, and the specific context

in which that language is used, and the broader context of the statute as a whole."  <u>Ceco Concrete</u>

<u>Const., LLC v. Centennial State Carpenters Pension Tr.</u>, 821 F.3d 1250, 1258 (10th Cir.

2016)(quoting <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341 (1997)).  If statutory meaning cannot

be derived "merely by reference to the text," a court "may also look to traditional canons of statutory

construction to inform our interpretation," <u>Conrad v. Phone Directories Co.</u>, 585 F.3d 1376, 1381

(10th Cir. 2009), and "may seek guidance from Congress's intent, a task aided by reviewing the

legislative history," <u>In re Geneva Steel Co.</u>, 281 F.3d at 1178.  "Ambiguous text can also be decoded

by knowing the purpose behind the statute." <u>In re Geneva Steel Co.</u>, 281 F.3d at 1178.

### <u>LAW REGARDING TEMPORARY RESTRAINING ORDERS</u>

 The requirements for a TRO issuance are essentially the same as those for a preliminary

injunction order.  <u>See</u> <u>People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd.</u>, 350 F.

Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-

83 (3d ed. 2004). The primary differences between a TRO and a preliminary injunction are that a

TRO may issue without notice to the opposing party and that TROs are limited in duration to

fourteen days.  <u>See</u> Fed. R. Civ. P. 65(b)(1)-(2).  In both cases, however, injunctive relief is an

"extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted. Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)). See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181. The Supreme Court of the United States and the United States Court of Appeals for the Tenth Circuit have explained that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, (1981). See Keirnan v. Utah Transit Auth., 339 F.3d 1217, 1220 (10th Cir. 2003)("'In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits.'")(quoting Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986)).

To establish its right to a temporary restraining order under rule 65(b), a moving party must demonstrate that "immediate and irreparable injury, loss, or damage will result" unless a court issues the order. Fed. R. Civ. P. 65(b). "[I]rreparable injury" is "harm that cannot be undone, such as by an award of compensatory damages or otherwise." Salt Lake Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355). A moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542, (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12 (1982)).

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. Nken v. Holder, 556 U.S. 418, 434 (2009). It is insufficient, moreover, that a moving

party demonstrate that there is only a "possibility" of either success on the merits or irreparable harm.  Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016)("Diné"). In Diné, the Tenth Circuit held that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in Winter v. Natural Resources Defense Council," which "overruled the [United States Court of Appeals for the] Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs ... could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm." Diné, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22). The Tenth Circuit concluded that, although the standard overruled in Winter v. Natural Resources Defense Council, Inc. dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor.  Diné, 839 F.3d at 1282.  Accordingly, the Tenth Circuit held that "any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  Diné, 839 F.3d at 1282.

Under rule 65(c), the Court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c). The United States and its officers and agencies are exempt from this requirement.  See Fed. R . Civ. P. 65(c). The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable.").  See also Flood v. ClearOne Comm'ns, 618 F.3 1110, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security,'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal,

552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Nebraska v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

## LAW REGARDING PRELIMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted). To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law." N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984). Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the preliminary injunction "outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "there is a substantial likelihood [of success] on the merits." Resolution Trust Corp. v. Cruce, 972 F.2d at 1198. See Winter, 555 U.S. at 19 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. at 688-89)). The movant bears the burden of demonstrating all four prongs' satisfaction. See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972). "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible." Diné, 839 F.3d at 1282. "A plaintiff suffers irreparable harm 'when the court would be unable to

grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'" Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura v. Hurley, 242 F.3d at 963)). "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of Colo., 427 F.3d at 1266.

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . .'" Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395). In that vein, the Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal quotation marks omitted)(quoting O Centro, 389 F.3d at 977). Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009)(citing O Centro, 389 F.3d at 975). Regarding mandatory preliminary injunctions, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro . . . 389 F.3d at 979). The Tenth Circuit has thus

disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

Salazar v. San Juan Cty. Det. Ctr., No. CV 15-0417 JB/LF, 2016 WL 335447, at *40 (D.N.M. Jan. 15, 2016)(Browning, J.). "When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at 'the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights.'" Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *40 (quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro, 389 F.3d at 975). "The meaning of this category is self-evident." Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41. With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction . . . ." United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)). See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy.

See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING 8 U.S.C. § 1225

Before jumping to § 1225(b)(2), it is important to zoom to 30,000 feet or more, and look at the United States and § 1225 as a whole.  The United States is the third-largest country in terms of land mass, and it has an approximately 5,525-mile border with Canada, U.S. Department of Homeland Security, Considerations for United States -- Canada Border Traffic Disruption Management, at 2 (2012), and 1,954-mile border with Mexico, U.S. Customs and Border Protection, Smart Wall Map, https://www.cbp.gov/border-security/along-us-borders/smart-wall-map (last visited Jan. 1, 2026).  Other entry points are Puerto Rico, the United States Virgin Islands, Guam, and other island territories.  See U.S. Department of the Interior, Insular Areas of the United States and Freely Associated States (last visited Jan. 1, 2026), https://www.doi.gov/library/internet/insular.[8]  In addition, aliens may seek entry into the United States in many ways, including stowing away in vehicles, and at many places, like the waters of the Rio Grande or the Arizona deserts.  See Fact Sheet, Modes of Entry for the Unauthorized migrant Population, Pew Research Center (May 22, 2006), https://www.pewresearch.org/race-and-ethnicity/2006/05/22/modes-of-entry-for-the-unauthorized-migrant-population/.

Each day the United States Customs and Border Protection ("CBP") must process over a million individuals.  See U.S. Customs and Border Protection, On a Typical Day in Fiscal Year 2024, CVP . . ., ("2024 CBP Statistics"), https://www.cbp.gov/newsroom/stats/typical-day-fy2024

---

[8] Other notable U.S. territories include the American Samoa and the Commonwealth of the Norther Mariana Islands.  See U.S. Department of the Interior, Insular Areas of the United States and Freely Associated States://www.doi.gov/library/internet/insular (last visited Jan. 1, 2026), https.

(last visited Jan. 8, 2025)(stating that CBP processes "1,150,387 passengers and pedestrians" on a typical day).[9]  That figure encompasses "4,267 nationwide enforcement encounters between ports of entry" each day and "3,682 nationwide enforcement encounters at ports of entry" each day. 2024 CBP Statistics.[10]  Extrapolating out, that means in that 2024, CBP encounters over 400 million passengers and pedestrians, and, of those, there are almost three million enforcement "encounters," or 0.69% of the arriving people, where the individual is not a citizen or does not have a lawful reason for entering the country.

In contrast to the CBP, which conducts screening at a scale involving hundreds of millions of arriving individuals, the United States Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO"), operates in an enforcement environment with lower volume.[11]  In 2024, ICE makes approximately 179,282 arrests, of which the ERO makes "113,431" administrative arrests and "33,243" "at-large" arrests.  2024 ICE Report at 2-3.  The difference in volume drives the practical reality between inspections and removal determinations. The scale and immediacy of inspection and admission determinations justify rapid, on-the-spot

---

[9] The CBP does not just process individuals.  On a typical day, CBP processes: "3.8 million de minimis shipments"; "88,582 truck, rail, and sea containers"; and "270,800 incoming privately owned vehicle."  2024 CBP Statistics.

[10] "Enforcement encounters" include U.S. Border Patrol ("USBP") Title 8 Apprehensions, Office of Field Operations ("OFO") Title 8 Inadmissibles, and Title 42 Expulsions, and this does not include citizens and individuals CBP admit through other lawful means.  See CBP, Nationwide Encounters Fiscal Year 2025, https://www.cbp.gov/newsroom/stats/nationwide-encounters-fy2025 (last visited Jan. 9, 2025).

[11] The Homeland Security Act of 2002 "created ICE by merging the investigative and interior enforcement elements of the former U.S. Customs Service and the Immigration and Naturalization Service."  ICE, Annual Report Fiscal Year 2024, at 8 (2024)("2024 ICE Report"). Within ICE, the ERO's mission is to protect "the homeland by arresting and removing noncitizens who undermine the safety of U.S. communities and the integrity of U.S. immigration laws . . . . [A]nd its primary areas of focus are interior enforcement operations, management of the agency's detained and non-detained populations, and removal efforts."  2024 ICE Report at 9.

judgments that may be based on incomplete information.  Mandatory removal and deportation decisions, by contrast, carry greater consequence and therefore lack the same justification for summary determinations.

Courts are often quick to criticize Congress -- the most important political branch in our democratic government -- for the way it writes laws.  Given the magnitude of writing a statute that governs the inspection of every citizen and alien's entry into the United States, the Court approaches the task of interpreting Congress' work with an appreciation for the extraordinary complexity of the task.  Section 1225 and § 1226 are not written against a small or static backdrop. They reflect Congress' effort to regulate admission decisions across vast borders, innumerable entry points, and an enormous volume of daily inspections.

1. **History of 8 U.S.C. § 1225.**

In 1996, Congress passes the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009-546 ("IIRIRA"), which amends the Immigration and Nationality Act ("INA"), 66 Stat. 166.  See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 473(1999).  The legislative history indicates that, in enacting IIRIRA, Congress seeks to "strengthen and tighten" immigration laws, addressing two interrelated concerns.  Arevalo v. Ashcroft, 344 F.3d 1, 4 (1st Cir. 2003).  First, Congress identifies a structural inequity in the pre-1996 regime where aliens who avoid ports of entry and enter the United States unlawfully are entitled to more extensive procedural protections in deportation proceedings than those who present themselves for inspection through lawful channels.  See Hing Sum v. Holder, 602 F.3d 1092, 1100 (9th Cir. 2010)("Hing Sum")(discussing that the IIRIRA eliminates the "'entry doctrine'" where aliens who enter the United States "without inspection could take advantage of the greater procedural and substantive rights affording in deportation proceedings, while aliens

who presented themselves at a port of entry for inspection are subject to more summary exclusion proceeding"). Second, Congress confronts a problem of administrative scale. See Am. Immigr. Laws. Ass'n v. Reno, 199 F.3d 1352, 1354 (D.C. Cir. 2000)("Reno"). By 1996, immigration officers are conducting inspections in the tens of millions annually, yet existing law permits broad opportunities to contest admissibility determinations through hearings, producing delay and strain on limited adjudicatory resources. 199 F.3d at 1354-55. Congress enacts the IIRIRA to correct both the inequity in procedural treatment and the practical burden imposed on the inspection system by amending the INA to eliminate its definition of "entry" and adding to § 1225 expedited removal proceedings.

      a.      **Applicants for Admission.**

The IIRIRA eliminates a distinction between aliens who are applicants for admission and aliens present in the United States. See Succar v. Ashcroft, 394 F.3d 8, 12 (1st Cir. 2005)("Succar")(stating that aliens either "(a) applicants for admission and (b) non-citizens present in the United States who had previously made an entry into the country either with, or without, an inspection"). For admission and removal, lawful admission -- not entry -- is now the defining concept. See Ira J. Kurzban, Immigration Law Sourcebook, Volume 1, chapter 3, § I.B, at 73 (18th ed. 2022)("Kurzban"). Entry is less important with Congress' enactment of the IIRIRA, in which Congress strikes the definition for "entry" from the INA and replaces entry with a definition of who is an applicant for admission. Kurzban, supra chapter 3, § I.B, at 73. By eliminating the definition of "entry," and replacing "entry" with the terms "admission" and "admitted," Congress "re-characterize[s] aliens who are present in the United States, but who have not been inspected and admitted" as "applicants for admission." Succar, 394 F.3d at 13. Congress defines admission

as the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

The re-characterization is important, because, before the IIRIRA, only "applicants for admission" are subject to "exclusion proceedings," but aliens present in the country without an inspection are subject to "deportation proceedings." Succar, 394 F.3d at 12-13. See Landon v. Plasencia, 459 U.S. 21, 25 (1982)("The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission."). Aliens subject to deportation proceedings are given more procedural protections than those subject to exclusion proceedings. See, e.g., Landon v. Plasencia, 459 U.S. 21, 25-26 (1982)(discussing the differences in the two types or proceedings, including the right of appeal for deportation proceedings but not in exclusion proceeding). Specifically, deportable aliens are "entitled [to] a hearing before a special inquiry officer in which the individual had the right to be represented, to examine the government's evidence, and to present evidence on his or her behalf." Make The Rd. New York v. Wolf, 962 F.3d 612, 618 (D.C. Cir. 2020)("Make the Road"). The distinction that immigration law historically draws between "deportation proceedings," which concern the removal of aliens already within the United States, and "exclusion proceedings," which concern the prevention of entry, reflect the long-recognized principle that "the Due Process Clause applies to all 'persons' within the United States, including aliens, regardless of whether their presence is lawful, unlawful, temporary, or permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001)("Zadvydas")(quoting U.S. Const. amend. XIV, § 1, and citing Plyler v. Doe, 457 U.S. 202, 210 (1982); Mathews v. Diaz, 426 U.S. 67, 77 (1976); Kwong Hai Chew v. Colding, 344 U.S. 590, 596-598, and n.5 (1953); Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886)). With IIRIRA's

enactment, Congress eliminates the dual system of deportation and exclusion proceedings, and replaces the dual system with the universal "removal proceedings," under which immigration officers process all aliens who are applicants for admission.  See Succar, 394 F.3d at 13.

Within the removal proceedings' current umbrella, Congress designates certain aliens as subject to "expedited" removal and other aliens subject to removal under § 1229a, "the usual removal process."  Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 108-09 (2020)("Thuraissigiam").  Similar to the previous "deportation proceedings," "[t]he usual removal process involves an evidentiary hearing before an immigration judge, and at that hearing an alien may attempt to show that he or she should not be removed."  Thuraissigiam, 591 U.S. at 108. Under IIRIRA's expedited removal provision, immigration officers "shall order the alien removed" if the immigration officer determines that the alien is inadmissible, "because she does not have a valid entry document or other suitable travel document, or because she has obtained a visa through misrepresentation."  Make The Road, 962 F.3d at 619 (citing 8 U.S.C. § 1225(b)(1)(A)(i)).  Under the expedited removal processes, there is no hearing and no opportunity for the alien to present evidence.  See Make The Road, 962 F.3d at 619 (stating that after the immigration officers' determination "all that stands between that individual and removal is a paper review by the officer's supervisor").   Aliens applying for asylum or claim a fear of prosecution are an exception to expedited removal proceedings.  See Thuraissigiam, 591 U.S. at 109 ("If an applicant 'indicates either an intention to apply for asylum' or 'a fear of persecution,' the immigration officer 'shall refer the alien for an interview by an asylum officer.'")(quoting 8 U.S.C. §§ 1225(b)(1)(A)(i)-(ii)).  Based on the asylum officer's determination, an arriving alien either receives "'full consideration of his asylum claim in a standard removal hearing," Thuraissigiam, 591 U.S. at 110 (quoting 8 C.F.R. § 208.30(f)); see 8 U.S.C. § 1225(b)(1)(B)(ii));

or the expedited removal proceedings of 8 U.S.C. § 1225(b)(1)), see Thuraissigiam, 591 U.S. at

110 (stating that "all that an alien must show to avoid expedited removal is a 'credible

fear'")(quoting 8 U.S.C. § 1158(b)(1)(A)).

> **b.   Expedited Removal**

Thus, with IIRIRA's passage, Congress closes the procedural anomaly of the "entry

doctrine," Hing Sum, 602 F.3d at1100, and gives immigration officers the tools to process the

"million[s of] primary inspections" occurring at the border, Reno, 199 F.3d at 1355.  Congress

passes the IIRIRA with the expedited removal provisions to address the practical reality that large

volumes of "arriving" aliens are overwhelming the usual removal processes.  See Reno, 199 F.3d

at 1355.   Congress therefore empowers immigration officers to resolve straightforward

inadmissibility determinations quickly where the alien "indisputably" has no authorization to be

admitted into the United States.   H.R. Conf. Rep. No.. 104–828, at 209 (1996)("House

Report")(stating that the "purpose of the provisions [paragraph (b)(1)] is to expedite the removal

from the United States of aliens who indisputably have no authorization to be admitted to the

United States . . . .").

Furthermore, "[n]ew paragraph (b)(2) provides that an alien determined to be inadmissible

by an immigration officer (other than an alien subject to removal under paragraph (b)(1), or an

alien crewman or stowaway) shall be referred for a hearing before an immigration judge under

new section 240."  House Report at 209.  The language "other than an alien subject to removal

under paragraph (b)(1)" in § 1225(b)(2)(A) is significant.   House Report at 209.   Section

1225(b)(1) authorizes immigration officers to conduct expedited removal for specified categories

of arriving aliens whom the officer determines to be inadmissible for reasons including fraud or

misrepresentation, see 8 U.S.C. § 1182(a)(6)(C), or a lack of valid entry documents, see

8 U.S.C. § 1182(a)(7).    Where the immigration officer makes such a determination, the immigration officer may order removal without further hearing or review, and impose the attendant statutory consequences, including a bar on reentry.  See 8 U.S.C. § 1182(a)(9)(A)(i) (stating that any "alien who has been ordered removed under section 1225(b)(1) of this title . . . who again seeks admission within 5 years of the date of such removal . . . is inadmissible").

      **2.**       **<u>Structure of 8 U.S.C. § 1225.</u>**

      In interpreting a Congressional statute, the plain language that Congress writes is the most important, but the statute's structure can help the Court interpret the statute's words.  Congress titles § 1225: "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing."  8 U.S.C. § 1225.  Thus, from the title, the reader can surmise that they are about: (i) inspection; (ii) expedited removal of arriving aliens; and (iii) referral for hearings.  The Court should be slow to read a lot more into § 1225 that what the title details.

      Section 1225 has four subparts: (i) "Inspection," 8 U.S.C. § 1225(a); (ii) "Inspection of applicants for admission," 8 U.S.C. § 1225(b); (iii) "Removal of aliens inadmissible on security and related grounds," 8 U.S.C. § 1225(c); and (iv) "Authority related to inspections," 8 U.S.C. § 1225(d).  The Court views § 1225's organization as reflecting a statutory design to address inspections by immigration officials, the expedited removal process, and the process of removing an alien after a hearing.  Each subpart addresses a discrete component of the inspection process, moving from examination to summary removal determinations and then to the ancillary powers necessary to carry out those functions.

      **a.**       **<u>8 U.S.C. § 1225(a): Inspection.</u>**

      As the title of § 1225 promises, Congress labels the first section "Inspection." 8 U.S.C. § 1225(a).    The Court does not quickly move past the word "Inspection."

8 U.S.C. § 1225(a).  "Inspection" denotes the "act of inspection," or "a checking or testing of an individual against established standards," Inspection, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/inspection. (last visited on Jan. 17, 2026), and to "inspect" means "to view closely in critical appraisal: look over" or "to examine officially," Inspecting, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/inspecting. (last visited on Jan. 17, 2026).  The ordinary meaning of inspection implies an, individualized encounter between an immigration officer and a single alien -- often an officer face-to-face with an alien for evaluation purposes.  The Court finds the word "inspection" difficult to reconcile with mass or abstract enforcement.  In addition to focusing on the words that the statute uses, it is also important to note what words § 1225 does not use.  Section 1225 does not speak in terms of "arrest" or "apprehension."  Those concepts are present in the INA, but their absence from § 1225's title and text indicates that Congress places those powers elsewhere, and § 1225 is in a distinct procedural posture -- often face-to-face inspection and examination at the threshold of entry.

Section 1225(a) gives the definition for five inspection terms that the statute uses.  Section 1225(a)(1)'s opening clause is foundational to the statute's operation, and Congress emphasizes its breadth through deliberate phrasing. Section 1225(a)(1) defines aliens who are "treated as applicant[s] for admission."  8 U.S.C. § 1225(a)(1).  For purposes of this chapter, immigration officers treat aliens as applicants for admission if they are:

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

8 U.S.C. § 1225(a)(1).  Notably, an alien is an "applicant for admission" if the alien is "present in the United States" and is "not admitted."  8 U.S.C. § 1225(a)(1).  The definition also covers aliens

"who arrive[] in the United States" regardless whether they arrive at a designated port of entry. 8 U.S.C. § 1225(a)(1).  With this scope, Congress indicates that § 1225 treats almost all aliens are as "applicants for admission."  It is hard to image how Congress could have written § 1225(a)(1) more broadly.

In § 1225(a)(1), the United States is passive.  The United States does not have to do anything -- such as effecting a stop -- to impose the status of "applicant for admission" upon an alien.  An alien "present" in the United States who has not been admitted or who arrives in the United States is, by law, an applicant for admission.  At the same time, § 1225(a) indicates that the aliens treated as "applicants for admission" has subgroups.  8 U.S.C. § 1225(a)(2).  For stowaways, who arguably, are aliens "present in the United States who [have] not been admitted" or is an alien "who arrives in the United States," and thus arguably an applicant for admission, the statutes states they are not eligible to apply for admission or to be admitted.  8 U.S.C. § 1225(a)(2).  Section 1225(a)(3), titled "Inspection," states all "aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3).  The statute use of "or otherwise seeking admission" suggests that aliens who are treated as applicant for admission are not coterminous with aliens who are "seeking admission." 8 U.S.C. § 1225(a)(3).  Thus, § 1225(a) suggest that not all applicants can apply for or seek admission.  The Court notes that § 1225(a) continues by defining "Withdrawal of application for admission," and "Statements." 8 U.S.C. §§ 1225(a)(4)-(5).[12]  Although § 1225 does not define "admission" or "admitted,"

---

[12] Section 1225 defines the withdrawal of application for admission by stating an "alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States." 8 U.S.C. § 1225(a)(4).

§ 1101(a)(13)(A) defines those terms as, "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

Section 1225(a) frames § 1225's scope by situating the section within an inspection-based posture. Congress specifies which aliens are subject to inspection -- those seeking admission or readmission -- and identifies those who are not, including stowaways. The provision further contemplates that an applicant for admission may withdraw the application and "depart immediately" from the United States, underscoring the section's focus on entry-stage judgments. 8 U.S.C. § 1225(a)(4). By anchoring § 1225 in inspection concepts that Congress defines, it signals that an inspection at the threshold of entry triggers the powers and procedures that follow. Section 1225(a) thus presupposes an alien whom the United States has not admitted, but is applying for admission, free to abandon the inspection process and depart without restraint.

**b.    8 U.S.C. § 1225(b): Inspection of Applicants for Admission.**

Congress titles § 1225(b): "Inspection of applicants for admission." 8 U.S.C. § 1225(b). In providing the process for inspecting "applicants for admission," Congress begins with subparagraph (b)(1), which governs the inspection of "aliens arriving in the United States and certain other aliens who have not been admitted or paroled." 8 U.S.C. § 1225(b)(1). Section 1225(b)(1) is the process for the "expedited" removal that Congress mentions in the title, even though the word "expedited" appears nowhere in subparagraph (b)(1). Congress allows § 1225(b)(1) to apply to "certain other aliens," and subparagraph § 1225(b)(2) governs the inspection of "other aliens." 8 U.S.C. § 1225(b)(2). As the Court discusses below, all aliens are run through § 1225 (b)(1) first, and if an alien is an "arriving alien" or a "certain other alien" in § 1225(b)(1)(A)(iii), the alien never becomes an "other alien" in § 1225(b)(2). <u>See</u>

8 U.S.C. § 1225(b)(2)(ii) ("Subsection (A) shall not apply to an alien -- (ii) to whom paragraph (1) applies . . . ."). The remaining provisions of § 1225(b) establish enforcement and review mechanisms, including authorization for State attorneys general to bring civil actions for harms arising from detention or removal under subparagraphs (b)(1) and (b)(2), see 8 U.S.C. § 1225(b)(3), as well as procedures for challenging determinations that immigration officers make, see 8 U.S.C. § 1225(b)(4). The heart of this dispute, in part, concerns the relationship between § 1225(b)(1) and § 1225(b)(2), and, given its significance, the Court describes these provisions in greater detail.

Section 1225(b)(1)'s title, "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," indicates Congress intends that immigration officers apply the following provision to two groups of aliens. 8 U.S.C. § 1225(b)(1). The two groups of aliens are "aliens arriving in the United States"[13] and "certain other." 8 U.S.C. § 1225(b)(1). Congress, after defining the class of applicants for admission subject to § 1225(b)(1), establishes a framework for the "screening" of arriving aliens, including procedures for asylum interviews and limitations on judicial review. 8 U.S.C. §§ 1225(b)(1)(A)-(C). Again, language is important.

### i.    Screening of Arriving Aliens.

---

[13] The Department of Homeland Security defines an "arriving alien" as:

An applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport.

8 C.F.R. § 1.2.

Congress says "screening" -- not arrest, not apprehension, and not custody. 8 U.S.C. § 1225(b)(1)(A).  Merriam-Webster defines "screen" to mean "to examine methodically in order to separate into different groups," "to select or eliminate by a screening process," or "to test or examine for the presence of something," reinforcing that § 1225(b)(1)'s use primarily is at a port of entry, at the border, or at an immigration office where an immigration officer must methodically separate inadmissible aliens from individuals whom Congress permits lawful entry. Screen, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/screen. (last visited on Jan. 18, 2026).  See Jennings, 583 U.S. at 285 ("Every day, immigration officials must determine whether to admit or remove the many aliens who have arrived at an official "port of entry" . . . or who have been apprehended trying to enter the country at an unauthorized location.").  The process is about screening -- inspection driven -- and not about the arrest or apprehension of aliens.  Furthermore, screening suggests that immigration officers often begins the screening and inspection process in the presence of the alien, after the alien presents to the immigration officer to verify entry documents.

### ii.    <u>"Arriving Aliens" are the Default Group.</u>

As the Court observes above, § 1225(b)(1) applies to two groups of aliens, and § 1225(b)(1)(A) further divides the groups into subgroups.  See 8 U.S.C. § 1225(b)(1)(A).  Section 1225(b)(1)(A)(i) states: "If an immigration officer determines that an alien . . . who is arriving in the United States or [] [certain other aliens] in clause (iii) is inadmissible under 1182(a)(6)(C) or 1182(a)(7) of this title . . . the officer shall order the alien removed from the United States without further hearing or review . . . ."  8 U.S.C. § 1225(b)(1)(A)(i).  "[C]ertain other aliens" includes an "alien . . . who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically

present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph." 8 U.S.C. § 1225(b)(1)(A)(iii).  Taken together, these provisions identify the universe of aliens subject to expedited removal following inspection, characterized by removal "without further hearing or review."   8 U.S.C. § 1225(b)(1)(A)(i).

Section 1225(b)(1)(A)(i) is the general rule, applying to aliens "arriving in the United States" but also to "certain other aliens" that Congress describes in "clause (iii)." 8 U.S.C. § 1225(b)(1)(A)(i).  Although Congress applies expedited removal to all aliens arriving or to whom clause (iii) is applicable, Congress pauses expedited proceedings for aliens claiming asylum until an asylum officer can make a determination under subparagraph (B).   See 8 U.S.C. § 1225(b)(1)(A)(i)-(ii).  The final provision, or the "Designation Provision," allows the Attorney General, now the Secretary of Homeland Security, see Awe v. Napolitano, 494 F. App'x 860, 863 (10th Cir. 2012),[14] to make the general rule for arriving aliens, of expedited removal, applicable to other groups subject.  See Make The Road, 962 F.3d at 619.

### (i).    Certain Other Aliens: Designation Groups.

Section 1225(b)(1)(A)(i) applies to aliens inadmissible for fraud or misrepresentation, or lack of documentation.   See 8 U.S.C. § 1225(b)(1)(A)(i) (referencing inadmissibility under §§ 1182(a)(6)(C) or 1182(a)(7)).  Fraud, misrepresentation, and lack of documentation constitute only two of several inadmissibility grounds, however.  In § 1182(a) Congress enumerates other

---

[14] The statute's reference to the Attorney General reflects prior administrative structure. See Awe v. Napolitano, 494 F. App'x 863 n.3.  Congress transfers authority to commence removal proceedings and adjudicate naturalization applications to the Secretary of Homeland Security in 2002, effective March 1, 2003.  See Ajlani v. Chertoff, 545 F.3d 229, 231 n.2 (2d Cir. 2008). Batalova v. Ashcroft, 355 F.3d 1246, 1248 n.1 (10th Cir. 2004).  Accordingly, references to the "Attorney General" in § 1225 are now properly understood to mean the Secretary of Homeland Security.

grounds, which include health-related grounds, criminal grounds, and security-related grounds, among others.  See 8 U.S.C. § 1182(a)(1)-(10).  Read in this context, the Court reads § 1225(b)(2) as broader than § 1225(b)(1), governing the inspection and processing of applicants for admission who fall outside the narrow subset subject to expedited removal under § 1225(b)(1), including those deemed inadmissible on grounds other than fraud or lack of documentation.  See 8 U.S.C. § 1225(b)(2) (governing the inspection of "other aliens").

### (ii).    Certain Other Aliens: Physical Presence.

Section 1225(b)(1) removes from expedited removal a second category of aliens.  See 8 U.S.C. § 1225(b)(1)(A)(iii)(II).  Section 1225(b)(1)(A)(iii)(II) limits immigration officers' application of expedited removal to "certain other aliens," whom the United States has not admitted or paroled into the United States, and who does not show continuous physical presence in the country for the two-year period immediately preceding the inadmissibility determination. 8 U.S.C. § 1225(b)(1)(A)(iii)(II).  By negative implication, Congress excludes from expedited removal admitted aliens, paroled aliens, and aliens who can demonstrate two years of continuous physical presence, even if they remain classified as applicants for admission under § 1225(a)(1).  See  8 U.S.C. § 1225(b)(1)(A)(iii)(II).  The physical-presence limitation thus gives operative content to Congress' decision to treat certain non-admitted aliens present inside the United States as applicants for admission for inspection purposes.  See 8 U.S.C. § 1225(a)(1) (treating as an applicant for admission both an arriving alien and an "alien present in the United States who has not been admitted").

Reading § 1225 to encompass a subset of aliens present in the United States accords not only with the statute's text, but also with Supreme Court guidance.  In Jennings v. Rodriguez, 583 U.S. 281 (2018)("Jennings"), the Court implicitly recognizes this structure.  See 583 U.S. at 297.

Justice Alito describes § 1225(b) as applying "primarily to aliens seeking entry into the United States." Jennings, 583 U.S. at 297. The modifier "primarily" implies that § 1225(b) also reaches some aliens who are not seeking entry. Aliens physically present within our borders, whom the United States has not admitted, are not "seeking entry," but instead are "seeking admission." 8 U.S.C. § 1225(b)(2)(A) (referring to an "alien seeking admission"). Justice Alito's further statement that "§ 1226 applies to aliens already present in the United States" creates no tension; both propositions coexist comfortably under the Court's reading of § 1225(b), which recognizes overlapping statutory categories rather than mutually exclusive ones.

The aliens whom § 1225(b)(1)(A)(iii)(II) covers includes, for example, aliens whose inspection at a port of entry is "deferred" by an immigration officer, and whom the officer temporarily permits the alien to enter the United States pending further inspection, see 8 C.F.R. § 235.2 ("Parole for deferred inspection."), as well as certain previously admitted aliens whose status reverts to that of an applicant for admission upon the commission of specified offenses, see 8 U.S.C. § 1101(a)(13)(C) (stating that a lawfully admitted alien "shall not be regarded as seeking an admission . . . unless the alien. . . . has committed an offense identified in section 1182(a)(2)). Congress authorizes expedited removal only where the applicant for admission cannot demonstrate two years of continuous physical presence. See 8 U.S.C. § 1225(b)(1)(A)(iii)(II). If an alien can demonstrate two years of physical presence, they are then subject to the usual removal proceedings under § 1229a, however, the alien remains an applicant for admission. See 8 U.S.C. § 1225(b)(2) (stating that an applicant for admission "shall be detained for a proceeding under section 1229a").

### (iii).    Certain Other Aliens: Paroled.

At the same time, Congress distinguishes "parole into the United States," under 8 U.S.C. § 1182(d)(5)(A), from "conditional parole" under § 1226(a), which authorizes release

- 36 -

from immigration custody pending removal proceedings, 8 U.S.C. § 1226(a)(2)(B). Conditional parole does not confer entry, does not alter an alien's status as an applicant for admission, and does not suspend the United States' pursuit of removal; conditional parole is similar to bail in the criminal context. See Cruz-Miguel v. Holder, 650 F.3d 189 (2d Cir. 2011)(stating that "akin to bail release in criminal cases, conditional parole merely permits an alien to remain at liberty based upon a determination that he poses no risk of danger or flight *while his removal is actively sought*")(emphasis in the original). The distinction between parole and conditional parole carries concrete statutory consequences. Aliens "paroled into the United States" are not subject to expedited removal under § 1225(b)(1). See 8 U.S.C. § 1225(b)(1)(A)(iii)(II).[15] They may also seek adjustment of their immigration status under § 1255(a). See 8 U.S.C. § 1255(a) (stating that "[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe"). Legislative history confirms the distinction between parole and conditional parole. See Ortega-Cervantes v. Gonzales, 501 F.3d 1111 (9th Cir. 2007)(discussing the 1960 amendment to 1255(a)). In the 1960, when Congress amends § 1255(a) to extend eligibility for adjustment of immigration status to paroled aliens, it did so with reference to parole granted under 8 U.S.C. § 1182(d), not to aliens who had entered without inspection and were later released from custody under the statutory precursor to § 1226(a). S.Rep. No. 86–1651 (1960), as reprinted in 1960 U.S.C.C.A.N. 3124, 3124-25, 3137 (extending § 1255 to "aliens paroled into the United States," but excluding those who "entered the United States surreptitiously"). This history indicates that Congress does not understand conditional parole for aliens who entered without

---

[15] The Court notes that persons who enter without inspection and are applicants for admission can qualify for parole under § 1182, see U.S.C. § 1182(d)(5)(A), or conditional parole under § 1226(a), see 8 U.S.C. § 1226(a)(2)(B).

inspection to be the same form of parole contemplated in § 1255 or in § 1225(b)'s exclusion from expedited removal.

Section 1225(b)(1), though textually narrower than § 1225(b)(2), performs the operational work within § 1225's inspection framework.  § 1225(b)(1) governs the inspection of "arriving" aliens and "certain other aliens," including aliens present in the United States who have not been admitted or paroled, and who cannot demonstrate two years of continuous physical presence. 8 U.S.C. § 1225(b)(1)(A)(i)-(iii).  By contrast, § 1225(b)(2) applies to the residual category of "other aliens" who are applicants for admission but fall outside the expedited-removal criteria and are therefore placed into the usual removal proceedings under § 1229a.  8 U.S.C. § 1225(b)(2). The scale of these provisions illustrates their functional roles.  In 2024, CBP conducts over 416 million inspections at the border, see 2024 CBP Statistic, while approximately 255,000 aliens file I-485 applications, from within the United States, to adjust status to lawful permeant residence, see Number of I-485 Applications to Register Permanent Residence or Adjust Status By Category, Case Status, and USCIS Field Office or Service Center Location January 1, 2024 - March 31, 2024,

https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.uscis.gov%2Fsites %2Fdefault%2Ffiles%2Fdocument%2Fdata%2Fi485_performancedata_fy2025_q1.xlsx&wdOri gin=BROWSELINK (last visited Jan. 16, 2025).[16]  Roughly, these figures indicate that the overwhelming majority of admissibility determination occur in § 1225(b)(1)'s inspection context -- over ninety-nine percent -- while only a small fraction of applicants for admission proceed

---

[16] A foreign national, who is already present in the United States, generally fills out Form I-485 to attain lawful permanent resident status.  See Alicia Ward, United States Lawful Permanent Residents: 2023, United States Department of Homeland Security at 2 (Sep. 9, 2024)("LPR Statistics").  Foreign nationals who live abroad or seek to enter the United States through a port of entry do not use Form I-485.  See LPR Statistics at 2.

through the more cumbersome pathway in § 1225(b)(2).  In theory, § 1225(b)(2) covers more categories of aliens; in practical operation, however, the United States processes most aliens through § 1225(b)(1), and § 1225(b)(2) functions as a narrow backstop.  This structure reflects Congress' intentional division between summary inspection-based determinations near the point of entry and interior inspections where the reliability of rapid admissibility determinations is suspect.

### iii.    **"Arriving" Aliens in § 1225(b)(1).**

Congress' words are important.  Section 1225 repeatedly focuses the reader on the word "arrive" -- "arriving aliens" in the title; aliens who "arrive" in applicants for admission; and "certain other aliens" immigration officers are to treat as if they are arriving.  Merriam-Webster defines "arrive" as an intransitive verb meaning "to reach a destination" or "to make an appearance: to come up on the scene."  Arrive, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/arrive.  (last visited on Jan. 18, 2026).  Congress envisions § 1225(b)(1) as generally applying to aliens who present at a port of entry upon reaching their destination -- the United States.  See 8 U.S.C. § 1225(b)(1)(A)(i) (stating the general rule of inspection).  These provisions are about applicants for admission who are seeking lawful entry, and that can occur at the border or on the interior when an alien arrives at an immigration office for deferred inspection or when an alien files Form I-485 to change their immigration status.  That Congress allows the Attorney General to extend this framework to "certain other aliens" present in the United States does not change Congress' intent that § 1225 is primarily about inspection for lawful entry; the extension confirms it.  8 U.S.C. § 1225(b)(1)(A)(iii).  Removing any doubt, Congress repeatedly employs the present participle "arriving."

Congress' use of the present participle "arriving" as an adjective modifying the noun "alien" is significant, because, in traditional grammatical terms, the present participle signals an imperfect or continuous aspect rather than a completed action.  See P. Peters, The Cambridge Guide to English Usage 409 (2004)(explaining particles "create different aspects for the verb" either "imperfect" or "perfect").  Unlike the past participle, which ordinarily conveys a completed or passive state, the present participle is active and describes an action that is ongoing or in progress.  See P. Peters, The Cambridge Guide to English Usage 409.  By choosing the active, imperfect form "arriving alien," Congress signals that § 1225(b)(1) applies to aliens who are in the process of inspection and arrival, and not to those whose entry is completed long ago and whose presence in the United States is no longer properly understood as "arriving."

The textual distinction between "arriving" aliens and aliens present in the interior of the country reflects a longstanding principle of immigration law's relationship with the Due Process Clause.  See Zadvydas, 533 U.S. 695 ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.").  As Justice Scalia explains, the Due Process distinction "makes perfect sense: with regard to the question of what procedures are necessary to prevent entry, as opposed to what procedures are necessary to eject a person already in the United States."  Zadvydas, 533 U.S. at 704 (Scalia, J., dissenting).  That procedural observation applies with full force here, as the statutory language reflects our nation's understanding of immigration law.  Applicants for admission, by presenting themselves for inspection, subject themselves to the United States immigration system.  An alien who does not seek admission through inspection is in a different procedural posture than an alien who has started the process of lawful entry.  That Congress makes stowaways, who attempt to

enter without submitting to lawful inspection, not eligible to apply for admission under § 1225 is confirmation enough of the difference in procedural posture.

### iv.    Section 1225(b)(2): "Other Aliens".

After § 1225(b)(1) carries all of that water -- dividing applicants for admission into subgroups, specifying who is subject to expedited removal, and describing how certain aliens can seek asylum -- it is only then that § 1225(b)(2) comes over the horizon for consideration. Section 1225(b)(2) "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." Jennings, 583 U.S. at 287. Congress entitles this provision "Inspection of other aliens" and labels § 1225(b)(2)(A) the rule "In general." Like § 1225(b)(1), it applies only to applicants for admission, but it governs a broader universe of aliens. See Jennings, 583 U.S. at 287 ("Section 1225(b)(2) is broader."). Section 1225(b)(2) addresses the inspection of "other aliens" that § 1225(b)(1) does not cover. 8 U.S.C. § 1225(b)(2). Congress is mindful, however, to distinguish this group of "other aliens" in § 1225(b)(2) from the "certain other aliens" in § 1225(b)(1)(A)(iii).

"In general . . . an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for proceedings under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A).[17]    Section 1225(b) establishes two removal pathways that operate following an

---

[17] Section 1229 is titled "Initiation of removal proceedings" and sets forth the regular removal process of § 1229a. 8 U.S.C. § 1229. Under §§ 1229 and 1229a, the United States charges an alien with removability, serves the alien with a notice to appear, brings the alien before an immigration judge, permits the alien to present evidence and argument, and affords the alien Board of Immigration Appeals review and, ultimately, allows Courts of Appeals review. See United States v. Gonzalez-Fierro, 949 F.3d 512, 519 (10th Cir. 2020). Section 1229a provides for "usual removal proceedings," Thuraissigiam, 591 U.S. at 108-09 (discussing the usual removal proceedings from the expedited proceedings), which differ from the expedited removal process that § 1225(b)(1) describes. See 8 U.S.C. § 1229(a)(b)(4) (discussing the alien's "rights in the

immigration officer's inspection of an applicant for admission and which apply to three classes of

aliens.  The first pathway, in § 1225(b)(1), provides that, if an immigration officer determines that

---

proceeding" compared with the immigration officers' determination without further hearings).

     Section 1229a is the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States," unless "otherwise specified in this chapter," including the "Expedited removal of aliens convicted of committing aggravated felonies," under 8 U.S.C. § 1228.  8 U.S.C. § 1229a(a)(3). Although 1229a is the exclusive procedure for removal proceedings, § 1229a does not mention "detention. 8 U.S.C. § 1229a.  Section 1229 presupposes detention.  See 8 U.S.C. § 1229(a)(2)(B) (stating that "[i]n the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under paragraph (1)(F)"). Accordingly, the power to detain aliens during those removal proceedings must come from outside those sections.  Indeed, the Supreme Court, in Jennings, all but confirms the authority to detain aliens civil during these proceedings comes from §§ 1225 and 1226.  See 583 U.S. 289 ("In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2).  It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c).").

     The United States' power to detain aliens that covers arriving aliens and "certain other aliens" is in § 1231, which is titled "Detention and removal of aliens ordered removed." 8 U.S.C. § 1231.  Section 1225(b)(1) provides for "expedited removal." 8 U.S.C. § 1225(b)(1). When an "the officer [] order[s] the alien removed from the United States," 8 U.S.C. § 1225(b)(1)(A), a "removal period" starts in § 1231.  8 U.S.C. § 1231(a)(1)(B)(i). Section 1231(a)(1) states that, "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period")." 8 U.S.C. § 1231(a)(1)(A). Section 1231(a)(2) then discusses "Detention" and states, "In general, [d]uring the removal period, the Attorney General shall detain the alien." 8 U.S.C. § 1231(a)(2)(A).

     As the Court discusses later, § 1226 governs apprehension and detentions of aliens. Section 1226 authorizes arrest upon warrant, and permits release on bond or conditional parole unless mandatory detention applies.  See 8 U.S.C. § 1226(a), (c).  By regulation, when the United States detains an alien under § 1226(a), the alien receives an initial bond hearing before an immigration judge.  See 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1).  The removal proceedings that the alien receives, however, are pursuant to § 1229a.

     Section 1225(b), by contrast, establishes expedited removal.  Aliens subject to § 1225(b)(1) may be ordered removed "without further hearing or review," save for the limited credible-fear process.  8 U.S.C. § 1225(b)(1)(A).  Under § 1225(b)(2), aliens the United States detains "for a removal proceeding" proceed under § 1229a just like those that the United States detains under § 1226.  A key difference between the United States detaining an alien under § 1225(b)(2) and § 1226 is not the ultimate process the alien receives during their § 1229a proceedings, but the initial bond hearing that applies only to § 1226 by regulation.

an alien "arriving in the United States" or "certain other aliens" present in the country are inadmissible, the officer orders removal without further hearing or review.   8 U.S.C. § 1225(b)(1)(A)(i).  The second pathway, in § 1225(b)(2), provides that immigration officers detain and remove "other aliens" under § 1229a's ordinary procedures.   8 U.S.C. § 1225(b)(2)(A). Within this framework, § 1225(b) contemplates four classes of aliens or noncitizens: arriving aliens, see 8 U.S.C. § 1225(b)(1)(A)(i); applicants for admission present in the United States but for less than two years, see 8 U.S.C. § 1225(b)(1)(A)(iii); applicants for admission present in the United States for longer than two years but are seeking admission, see 8 U.S.C. § 1225(b)(2)(A), and a residual category of other aliens, including crewmen and stowaways, whom are not eligible to apply for admission, see 8 U.S.C. § 1225(b)(2)(B).

The statute's language reflects an inspection-centered posture.  An immigration officer's inspection of an alien in the posture of seeking admission triggers both § 1225(b)'s removal pathways -- expedited removal under § 1225(b)(1) and the usual removal under § 1225(b)(2) -- and the pathways operate as alternative outcomes of the inspection process.  Further confirming the inspection posture, § 1225(a)(2) specifies that stowaways are not eligible to apply for admission, and § 1225(b)(2)(B)(iii) correspondingly excludes stowaways from detention for non-expedited removal proceedings.   From this statutory pairing, i.e. the relationship between § 1225(b)(1) and § 1225(b)(2), the Court sees Congress' intent as tying the concept of an "applicant for admission" to inspection rather than to a freestanding status untethered from the inspection context.

That understanding aligns with §1101's statutory definition of "admission," which defines the term as "lawful entry . . . after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).   The relationship between "applicant for admission" and lawful

inspection also accords with § 1225(a)'s provision permitting an applicant for admission to withdraw an application for admission and depart immediately from the United States, reflecting Congress' expectation that the inspection process occurs at the threshold of entry and that aliens who do not wish to submit to that process may simply leave. 8 U.S.C. § 1225(a)(4). Outside of that inspection framework, § 1225 provides no independent scheme for detaining aliens; it instead contemplates either inspection leading to admission or removal, or immediate departure in lieu of inspection. The remaining § 1225 sections serve to reinforce that Congress is concerned the inspection of applicant for admission at the border.

### v.        Section 1225(b)(2)(A): An Alien Seeking Admission.

Congress' words matter. Section 1225 establishes an inspection-based regime governing the treatment of arriving aliens and aliens present in the country. See 8 U.S.C. § 1225(a)(1). Within that framework, § 1225(b)(2) operates as an exception to the "expedited" removal under § 1225(b)(1), providing aliens the usual removal proceeding, under § 1229a, only when three conditions are met: (i) the alien is an applicant for admission; (ii) the alien is "seeking admission"; and (iii) the examining immigration officer determines that the alien is not clearly and beyond doubt entitled to be admitted. 8 U.S.C. § 1225(b)(2)(A). Section 1225(b)(2)(A) distinguishes between the legal status of being an applicant for admission and the act of seeking admission.

Congress uses the phrase "seeking admission" only sparingly in § 1225 and always with precision. Cf., 8 U.S.C. § 1225(a)(2) (providing that stowaways are not "eligible to apply for admission or to be admitted"). The phrase first appears in the inspection clause: "All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). The phrase appears again in the statements provision: "An applicant for

admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States." 8 U.S.C. § 1225(a)(5). And it appears a third time in § 1225(b)(2)(A). That the phrase is absent from the section otherwise is no coincidence. In the inspection clause, Congress' use of "or" confirms that being an applicant for admission is not coterminous with seeking admission; the section treats them as related but distinct concepts. 8 U.S.C. § 1225(a)(3). In the statement clause, Congress uses "seeking admission" to describe purposeful acts by the applicant for admission, linking the phrase to conduct rather than status. 8 U.S.C. § 1225(a)(5). When Congress then employs the same phrase again in § 1225(b)(2)(A), it again does so such that the phrase helps readers understand applicants for admission. The Court sees no reason to treat the insertion as accidental or redundant.

Ordinary meaning confirms the point. "Seek" means "to go in search of," "to ask for," or "to request." Seek, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/seek. (last visited on Jan. 19, 2026). "Seek" denotes action directed toward a goal, and not a static label. "Admission" or "admitted" means "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). With those definitions in mind, "seeking admission" naturally refers to the act of "asking for" or "requesting" lawful entry through inspection or authorization. The phrase therefore narrows the broader universe of "applicants for admission," which encompasses everyone present in the United States, who has not been admitted, and arriving aliens. 8 U.S.C. § 1225(a)(1). Although the phrase "seeking admission" narrows the class of aliens to whom § 1225(b)(2) applies, it would be mistaken to read the provision as limited exclusively to physical border encounters. An alien may seek lawful entry at a port of entry, but an alien may

also seek lawful admission from within the United States through statutory mechanisms such as an application for adjustment of status on Form I-485 or other congressionally authorized procedures for obtaining lawful admission.

Congress' drafting is methodical.  Section 1225(b)(1) governs arriving aliens and designated "certain other aliens."  8 U.S.C. § 1225(b)(1).  The use of "certain other aliens" in §§ 1225(b)(1) and 1225(b)(1)(A)(iii) is careful craftsmanship by Congress to aid readers in not confusing those aliens with the "other aliens" it describes in § 1225(b)(2).  Congress is careful, because it does not want applicants for admission receiving removal proceedings under § 1229a when expedited proceeding are appropriate.  Reading "seeking admission" to do real work preserves that purpose and the section's structure.  Reading the phrase as surplusage would collapse it.  See Castañon-Nava, 2025 WL 3552514 *9 (stating the presumption against reading a phrase as superfluous is 'strongest when an interpretation would render superfluous another part of the same statutory scheme')(quoting Marx v. Gen. Rev. Corp., 568 U.S. 371, 386 (2013)).

The structure of § 1225 confirms this reading.  Section 1225(b)(1) sets forth the general rule governing inspections of applicants for admission.  See 8 U.S.C. § 1225(b)(1)(A).  Section 1225(b)(2) then appears on the horizon as a residual provision, applying only to "other" applicants for admission that § 1225(b)(1) does not cover.  See Jennings, 583 U.S. at 287 (describing § 1225(b)(2) as the "catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)").  This sequencing reflects a familiar statutory pattern.  Congress states the general rule first and then follows it with the exceptions to the general rule.  Reading § 1225(b)(2) to govern all applicants for admission, without qualification, inverts the statutory pattern, allowing the residual provision to swallow the general rule.  Statutory interpretation does not permit such an inversion.

c.    **8 U.S.C. § 1225(c)**.

Section 1225(c) covers the removal of inadmissible aliens based on security and related grounds, including removal without further hearing, the Attorney General's review of a removal order, and submission of a statement and information for the attorney general to consider.  <u>See</u> 8 U.S.C. §§ 1225(c)(1)-(3).  Subparagraph (c)(1) states that, if an immigration officer "suspects that an arriving alien may be inadmissible under . . . section 1182(a)(3) of this title," the immigration officer shall "order the alien removed."  8 U.S.C. § 1225(c)(1).  The specific subparagraphs that § 1225(c)(1) contemplates are subparagraphs §§ 1182(a)(3)(A)-(C).  <u>See</u> 8 U.S.C. § 1225(c)(1).

Section 1182(a)(3) covers the class of aliens who are "ineligible for visas or admission" for security related reasons.  8 U. S. C. § 1182(a)(3).  Subparagraph 1182(a)(3)(A) is the general rule that applies to any alien who "seeks to enter" the United States for nefarious purposes, including espionage and attempting to overthrow the government.  8 U. S. C. § 1182(a)(3)(A).  Similarly, subparagraph 1182(a)(3)(B), which applies to terrorist activities, contemplates an alien engaging in terrorist activity "after entry" into the United States.  8 U.S.C.§ 1182(a)(3)(B)(i)(II).  Finally, subparagraph 1182(a)(3)(C) applies generally to aliens "whose entry or proposed activities in the United States . . . would have potentially serious adverse foreign policy consequences."  8 U.S.C. § 1182(a)(3)(C)(i).

d.    **8 U.S.C. § 1225(d)**.

Section 1225(d) provides immigration officers with "[a]uthority relation to inspection."  8 U.S.C. § 1225(d).  The authority that Congress gives is the authority to search conveyances, or vehicles,[18] order detention and delivery of arriving aliens, administer oaths and consider evidence,

---

[18] The Merriam-Webster Dictionary defines "conveyance" as "a means or way of conveying: such as . . . a means of transport: vehicle."  Conveyance, Merriam-Webster.com

and to issue subpoenas.  See 8 U.S.C. § 1225(d)(1)-(4).  The authority to search vehicles allows immigration officers to "board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States." 8 U.S.C. § 1225(d)(1).  The authority to detain allows immigration officers to order anyone "bringing an alien . . . to the United States" to detain the alien "on the vessel or at the airport of arrival, and to deliver the alien to an immigration officer for inspection or to a medical officer examination."  8 U.S.C. § 1225(d)(2)(A)-(B).  Section 1225(d)(3) relates to immigration officers' ability to administer oaths and take evidence "touching the privilege of any alien . . . to enter, reenter, transit through, or reside in the United States."  8 U.S.C. § 1225(d)(3).  Finally, the subpoena authority allows immigration officers to require "the attendance and testimony of witnesses . . . and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter."  8 U.S.C. § 1225(d)(4).

Section 1225(d) reinforces that § 1225's scheme operates in an inspection-based posture. Congress entitles this subsection "Authority relating to inspection," and Congress frames the powers it confers around identifying, examining, and processing individuals at or near the point of entry.  8 U.S.C. §§ 1225(d)(1)-(4).  The authority to board and search vessels, aircraft, and other conveyances reflects a focus on intercepting and examining aliens who are arriving or are at the threshold of entry.  See 8 U.S.C. § 1225(d)(1).  Further reinforcing the threshold character of the statute, §§ 1225(d)(2)(A)-(B) limits the immigration officers' authority to direct carriers to detain

---

Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/conveyance.   (last visited on Jan. 14, 2026).

aliens on vessels or at airports of arrival, and to deliver those aliens for inspection, underscoring that the provision operates in the context of entry screening.  See 8 U.S.C. §§ 1225(d)(2)(A)-(B).

The remaining inspection authorities follow a similar theme.  Congress authorizes immigration officers to administer oaths and to take evidence concerning an alien's privilege to enter, to reenter, to transit through, or to reside in the United States, and to issue subpoenas for testimony and documents relating to that privilege.  See 8 U.S.C. § 1225(d)(3)(4).  These provisions contemplate fact finding and adjudicative functions tied to determining admissibility and entry status, and not generalized deportation or removal functions.  Read in context, § 1225(d) supplies the operational tools necessary for immigration officials to conduct inspections and to make entry determinations, further confirming that Congress does not envision § 1225's detention and removal mechanisms apart from the inspection of an arriving applicant for admission inspect.

By contrast, § 1226 speaks in remarkably different terms.  Section 1226 governs the "Apprehension and detention of aliens."  8 U.S.C. § 1226.  This section employs language associated with warrants, see 8 U.S.C. § 1226(a); work authorization, see 8 U.S.C. § 1226(a)(3); and the prior convictions, see 8 U.S.C. § 1226(c)(E)(ii).  In the Court's view, the contrast between the inspection-focused terminology of § 1225 and the more ordinary, post-entry language of § 1226 reflects Congress' considered judgment that different procedures are appropriate for preventing entry than for removing individuals who have already entered and established presence.  Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, (2020)(Alito, J.)("Thuraissigiam")(discussing the "century-old rule regarding the due process rights of an alien seeking initial entry" and an alien who has "'effected an entry'")(quoting Zadvydas, 533 U.S. at 693).

### 3. **Due Process**.

The courts cannot interpret the INA and the role § 1225 plays in its statutory scheme apart from the Constitutional principles that historically govern the relationship between due process and the sovereign authority to admit or exclude noncitizens. See Thuraissigiam, 591 U.S. at 139-140. The Court is mindful, however, to differentiate between due process the statute requires and Constitutional Due Process. See Rodriguez v. Marin, 909 F.3d 252 (9th Cir. 2018)(stating that the Supreme Court, in Jennings, "chose to answer only the question whether the statutory text itself included a limit on prolonged detention or a requirement of individual bond hearings . . . . The Court then remanded the constitutional issues to our court"). Below, the Court details the law regarding: (i) Constitutional Due Process, (ii) immigration law and due process, and (iii) how those bodies of law shape courts' statutory interpretations of the INA.

### a.    The Due Process Clause.

The Fifth Amendment to the United States Constitution states that the government shall not deprive any person "of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V, § 1. The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires the government to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that the government cannot deprive a person of a protected interest for certain reasons. See Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).

### i.    Procedural Due Process.

The Tenth Circuit prescribes a two-step inquiry in determining whether the defendant violates an individual's procedural due process rights: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)). "[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court requires "due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries," and "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty", the Supreme Court states the following:

> Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.  Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)].  See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)].  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract."  Teigen v. Renfrow, 511 F.3d at 1079.  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "Property interests, of course, are not created by the Constitution.  Rather they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to

those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of

Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject

of the present litigation, 'are created and their dimensions are defined by existing rules or

understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents

of State Colls. v. Roth, 408 U.S. at 577)).

　　　　"[O]nce it is determined that the Due Process Clause applies, the question remains what

process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey

v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation

of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the

nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is

flexible and calls for such procedural protections as the particular situation demands." Mathews

v. Eldridge, 424 U.S. at 334.  The Supreme Court explains that

> the root requirement of the Due Process Clause [is] that an individual be given an
> opportunity for a hearing before he is deprived of any significant property interest.
> This principle requires some kind of a hearing prior to the discharge of an employee
> who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate.  We have
> pointed out that [t]he formality and procedural requisites for the hearing can vary,
> depending upon the importance of the interests involved and the nature of the
> subsequent proceedings.  In general, something less than a full evidentiary hearing
> is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted).

　　　　The United States Court of Appeals for the Second Circuit states:

> The Supreme Court . . . explained that procedural due process is a flexible standard
> that can vary in different circumstances depending on "'the private interest that will
> be affected by the official action'" as compared to "the Government's asserted
> interest, 'including the function involved' and the burdens the Government would
> face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507,
> [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335).  A court must

> carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'"  Id. (quoting Mathews v. Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The required hearing depends on: (i) the private interest at stake; (ii) the risk of erroneous deprivation given the procedures the government already guarantees, and whether additional procedural safeguards prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful post-deprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires pre-deprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has considered procedural due process violations.  See, e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concludes that the New Mexico Department of Health violates due process when it affords a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it affords her no process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court also concludes a municipality does not deny due process to tenured city employee when the city fired him, because the city affords him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due

process claims where a State employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); Camuglia v. City of Albuquerque, 375 F. Supp. 2d at 1299, aff'd 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

### ii.    Substantive Due Process.

There are two substantive due process claims: (i) where the plaintiff alleges that the government infringes upon a fundamental right, see Washington v. Glucksberg, 521 U.S. 702, 721-22 (1997)("Glucksberg"); and (ii) where the plaintiff alleges that a government action deprives arbitrarily the plaintiff of life, liberty, or property, in a manner that shocks the judicial conscience, see Rochin v. California, 342 U.S. 165, 172 (1952)(concluding that a sheriff's application of stomach pumping to force an arrestee to vomit shocked the conscience). The Tenth Circuit "appl[ies] the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action." Halley v. Huckaby, 902 F.3d 1136, 1153 (10th Cir. 2018). But see Seegmiller v. LaVerkin City, 528 F.3d 762, 768 (10th Cir. 2008)(Tymkovich, C.J.)(explaining that "there is no hard-and-fast rule requiring lower courts to analyze substantive due process cases under only the fundamental rights or shocks the conscience standards"). But see also Dawson v. Bd. of Cty. Comm'rs, 732 F. App'x 624, 636 (10th Cir. 2018)(Tymkovich, C.J., concurring)(noting that, "though our circuit has sometimes repeated Seegmiller's 'both tests work' dicta, we do not follow it. Instead, we follow a simple binary approach" which applies the fundamental rights test to legislative actions and the shocks-the-conscience test to executive actions)(quoting, see, e.g.,

Leatherwood v. Allbaugh, 861 F.3d 1034, 1046 n.11 (10th Cir. 2017)(explaining both tests could be used in case about revocation of a defendant's suspended sentence)).

The fundamental rights approach proceeds in three steps.  See Abdi v. Wray, 942 F.3d at 1028.  First, the court must evaluate whether a fundamental right is at issue either: (i) "because the Supreme Court or the Tenth Circuit has already determined that it exists"; or (ii) "because the right claimed to have been infringed by the government is one that is objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' such that it is 'fundamental.'"  Abdi v. Wray, 942 F.3d at 1028 (quoting Glucksberg, 521 U.S. at 720-21).  Second, the court determines whether the right at issue "has been infringed through either total prohibition or 'direct and substantial' interference."  Abdi v. Wray, 942 F.3d at 1028 (quoting Zablocki v. Redhail, 434 U.S. 374, 387 (1978)).  Third, if the right is fundamental, the Court must determine whether the government action at issue satisfies strict scrutiny.  See Abdi v. Wray, 942 F.3d at 1028 (noting that the government must "me[e]t its burden to show that the law . . . is narrowly tailored to achieve a compelling governmental purpose").  If the right is not fundamental, however, the Court applies rational basis review.  See Reno v. Flores, 507 U.S. 292, 305 (1993)(explaining that strict scrutiny is requires "only when fundamental rights are involved").

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge."  Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force does not shock the conscience even if the suspect does not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir.

2013)(unpublished)).  For Executive action to shock the conscience, that action must be more than mere negligence.  E.g., Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)("Moore").  Indeed, even a reckless official's or the action of one bent on injuring a person do not necessarily shock the judicial conscience.  Moore, 438 F.3d at 1040.  "'Conduct that shocks the judicial conscience' is 'deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice.'"  Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir.2013)("Hernandez")(quoting Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir.2008)).  "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or 'employed it as an instrument of oppression.'"  Hernandez, 734 F.3d at 1261 (quoting Williams v. Berney, 519 F.3d 1216, 1220 (10th Cir.2008)).  "The behavior complained of must be egregious and outrageous."  Hernandez, 734 F.3d at 1261.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998)(stating that Rochin v. California, 342 U.S. 165 (1952) set the "benchmark" of executive abuse of power at "conduct 'that shocks the conscience' and violates the 'decencies of civilized conduct'")(quoting Rochin v. California, 342 U.S. at 172-173); Breithaupt v. Abram, 352 U.S. 432, 435 (1957)("We set aside the conviction because such conduct 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency.")(quoting Rochin v. California, 342 U.S. at 174).

### b.    Due Process and Immigration Law.

"[T]he power to admit or exclude aliens is a sovereign prerogative."  Landon, 459 U.S. at 32 (citing as examples United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950), and Nishimura Ekiu v. United States, 142 U.S. 651, 659-60 (1892)).  See Thuraissigiam, 591 U.S. at 139 (stating the sovereign's prerogative is a "fundamental proposition").  The United States'

plenary power to admit or exclude aliens is no longer plenary once an alien enters the country,  see Landon, 459 U.S. at 32 ("Once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."), because the Due Process Clause applies to "all persons," Zadvydas, 533 U.S. at 693.  In 1886, the Supreme Court says:

> The fourteenth amendment to the constitution is not confined to the protection of citizens. It says: "Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.

Yick Wo v. Hopkins, 118 U.S. at 369 (quoting U.S. Const. amend. XIV, § 1).  Yick Wo v. Hopkins deals with California detaining Chinese aliens without due process of law.  118 U.S. at 368-369. Accordingly, whether an alien is "within" the United States is a determination with Constitutional significance.  See Leng May Ma v. Barber, 357 U.S. 185, 188 (1958)("Leng May Ma")(stating that the Court recognizes "additional rights and privileges" for alien "within the United States after an entry, irrespective of its legality").  Immigration law balances the United States' prerogative to admit or exclude with the constraints the Due Process Clauses places on United States by distinguishing between aliens who are "on the threshold of initial entry," Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953)("Mezei"), and those who gain a "foothold" or effect entry in the United States, see Kaplan v. Tod, 267 U.S. 228, 258 (1925)("Kaplan").  Congress legislates against this settled Constitutional background of aliens at the threshold of entry and those who effect an entry.

### i.    On the Threshold of Entry.

"The entry-doctrine fiction has always determined when and under what circumstances due process applies in proceedings."  Kurzban, supra, chapter 3, § 1.H, at 80.  Although IIRIRA ends

the traditional distinction between exclusion and deportation proceedings, the entry doctrine endures regarding whether someone has Constitutional rights if they are in the United States, even if the United States has not admitted the alien.  See Kurzban, supra, chapter 3, § 1.H, at 80.  For more than a century, the Supreme Court recognizes that an alien seeking entry "requests a privilege," Landon, 459 U.S. at 32, and possesses only those procedural protections which Congress chooses to provide, because the power to admit or exclude aliens is a core sovereign prerogative, see U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950)("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").  The United States' power over aliens on the "threshold of entry" does not change because an alien sets foot on United States' soil.  Thuraissigiam, 591 U.S at 140 (stating that, even if the alien makes his way "25 yards into U.S. territory," he is treated as an applicant for admission "'on the threshold'" of entry)(quoting Mezei, 345 U.S. at 212).  Nor does the power change because an alien is "paroled elsewhere in the country for years pending removal"; they, too, are "'treated for due process purposes 'as if stopped at the border.'"  Thuraissigiam, 591 U.S at 139 (quoting Mezei, 345 U.S. at 215).  Thus, the sovereign's prerogative endures for any alien stopped at the border or "detained shortly after unlawful entry" despite circumstances that might suggest the alien effects an entry.  Kaplan, 267 U.S. at 257-58 (stating that, "in theory of law," an alien is inadmissible, but immigration officers permit the aliens to reside in the United States for nine years, nonetheless remains "at the boundary line" and for purposes of due process has "gained no foothold in the United States" for purposes of due process).  See Leng May Ma 357 U.S. at 188-90 (1958)(stating that an alien "paroled" into the United States pending admissibility has not effected an "entry").  Aliens, whom the United States treats as "at the boundary line," receive less

Constitutional Due Process protections than an alien who effects an entry without first encountering the United States.

### ii.  __Effected Entry__.

By contrast, once an alien effects entry and develops a presence within the United States, removal implicates greater Constitutional protections.  See Landon, 459 U.S. at 34 ("Our cases have frequently suggested that a continuously present resident alien is entitled to a fair hearing when threatened with deportation.").  Whether an alien effects entry is not purely a question of presence in the country or temporal conditions; the question goes to the connection and the relationship between the United States and the alien.  See United States v. Verdugo–Urquidez, 494 U.S. 259, 271 (1990)(stating in dicta that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); Kwong Hai Chew v. Colding, 344 U.S. 590, 596 n.5, (1953)("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.  But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders."); Yamataya v. Fisher, 189 U.S. 86, 100-01 (1903)(withholding judgment on question "whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, and who has been here for too brief a period to have become, in any real sense, a part of our population, before his right to remain is disputed").

For example, in Osorio-Martinez v. Attorney General of the United States, 893 F.3d 153 (3d Cir. 2018)("Osorio-Martinez"), the United States Court of Appeals for the Third Circuit considers two classes of aliens subject to expedited removal under § 1225(b) and the related jurisdiction-stripping provision in § 1252.  See Osorio-Martinez, 893 F.3d at 162-63.  The first

class consists of aliens "apprehended within hours of entering the country," Osorio-Martinez, 893 F.3d at 166, while the second class consists of aliens physically present in the United States who qualify for Special Immigrant Juvenile status under 8 U.S.C. § 1101(a)(27)(J).   See Osorio-Martinez, 893 F.3d at 163.  In Castro v. Department of Homeland Security, 835 F.3d 422 (3d Cir. 2016)("Castro"), the Third Circuit addresses the first class and holds that § 1225 does not violate the Constitution, reasoning that the petitioners' claims are "based on physical presence alone," and the claims arise in the context of aliens seeking initial entry or whom are apprehended immediately after entry.  Osorio-Martinez, 893 F.3d at 166 (citing Castro, 835 F.3d at 448).  See Castro, 835 F.3d at 448 (stating that "most of the cases cited above did not involve aliens who were seeking initial entry to the country or who were apprehended immediately after entry.").  By contrast, in Osorio-Martinez, the Third Circuit holds that § 1252's jurisdiction-stripping clause is unconstitutional as applied to the second class of aliens, concluding that those aliens have "significant ties to this country" sufficient to trigger greater constitutional protection.  Osorio-Martinez, 893 F.3d at 167.  The Third Circuit thus reaffirms the longstanding distinction between aliens at or near the threshold of entry, and those who have effected entry, and establish presence within the United States for purposes of due process analysis.

Because the Constitution distinguishes between aliens who effect an entry and those who remain at the threshold of entry, an alien who enters the United States may, in certain circumstances, receive greater procedural protections than an alien seeking initial admission.  The Supreme Court has repeatedly explained that, for aliens at the threshold of entry, the Constitution requires no procedural process beyond that which Congress has provided by statute to govern their application.  See Mezei, 345 U.S. at 212 ("'Whatever the procedure authorized by Congress is, it

is due process as far as an alien denied entry is concerned.'")(quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950).

### iii.   Paroled and Conditional Parole.

Consistent with the "effected entry" framework, Congress has long exercised the power to permit an alien's physical presence within the United States while treating that individual, as a matter of law, as remaining at the threshold of entry -- a legal fiction most clearly embodied in the parole doctrine.  "[A] deferred inspection necessarily involves parole into the United States under INA § 212(d)(5)," 8 U.S.C. § 1182(d)(5).   Charles Grodan, Stanley Madman, Yale-Loser, Immigration Law and Procedure, § 8.05 [2][d], at 8-17 ("Gordan").   Parole permits physical ingress to the United States without formal admission; "conceptually, a person remains on the border, lacking the rights that accompany admission."  Gordan, supra, § 8.05[2][d], at 8-17.  Stated another way, parole is not an admission -- either at the border or out of detention.  See Leng May Ma v. Barber, 357 U.S. at 190; 8 U.S.C. § 1282(d)(5).

Congress' parole provisions reinforce the distinction between physical presence and legal entry that runs throughout immigration law.  See Kaplan, 267 U.S. at 257-58.   Section 1182(d) authorizes the Secretary of Homeland Security to "parole into the United States" an alien applying for admission for "urgent humanitarian" or "significant public benefit" reasons, while expressly providing that such parole "shall not be regarded as an admission."   8 U.S.C. § 1182(d)(5)(A). Parole therefore permits an applicant for admission to reside temporarily within the United States while remaining, in theory of law, at the threshold of entry.  See Kaplan, 267 U.S. at 257-58.  The parole framework, thus, allows the political branches to accommodate humanitarian and administrative needs without conferring the constitutional and statutory protections that attach to aliens the United States admits or those who establish a presence within the country.

c.    **Statutory Due Process**.

In balancing the sovereign's prerogative to admit or exclude with the Due Process Clause's protections of all persons within the United States borders, the Supreme Court issues several opinions, in Zadyvdas, Jennings, and Thuraissigiam, interpreting the INA touching on the issues of due process. Although the legal questions that the Supreme Court confronts in each of the cases is not the same, the legal discussion is instructive on how to navigate the intersection of immigration law and due process.

i.    **Supreme Court Guidance**.

In Zadvydas, the Supreme Court considers whether the immigration detention statute governing post-removal-order custody, see 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V), authorizes the indefinite detention of aliens whom the United States cannot deport. See Zadvydas, 533 U.S. at 682. Both petitioners are lawful permanent residents whom the United States determines are removable based on their criminal convictions. See 533 U.S. at 684-86. After the statutory ninety-day removal period expires, the United States can repatriate neither petitioner because no country will accept them. See 533 U.S. at 684-86. The United States nevertheless continues to detain them under the post-removal detention statue, despite the ninety-day timeframe that Congress places in §1231(a)(6). See 533 U.S. at 682. The petitioners file habeas petitions, under 28 U.S.C. § 2241, arguing that permanent confinement is contrary to the Constitution. See Zadyvdas, 533 U.S. at 685.

The Supreme Court begins by stating a "statute permitting indefinite detention of an alien would raise a serious constitutional problem." See Zadyvdas, 533 U.S. at 690. "The Fifth Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of . . . liberty . . . without due process of law.' Freedom from imprisonment -- from government custody,

detention, or other forms of physical restraint -- lies at the heart of the liberty that Clause protects." Zadyvdas, 533 U.S. at 690 (quoting the U.S. Const. amend. V, § 1)(alterations in the original). Continuing with its analysis, the Supreme Court states that only a sufficiently strong governmental interest, accompanied by adequate procedural safeguards, can justify civil detention.   See Zadyvdas, 533 U.S. at 690.   Preventing flight and protecting the community can justify limited detention, but the Supreme Court states that indefinite detention without a realistic prospect of removal cannot be Constitutional.   See Zadyvdas, 533 U.S. at 692.   Importantly, the Supreme Court rejects the United States reliance on Mezei, explaining that, once an alien enters the United States, "the legal circumstances change[]," because the Due Process Clause applies to all persons within the United States, regardless of the legality of their presence.   Zadyvdas, 533 U.S. at 693.

To avoid the Constitutional problem, the Supreme Court construes 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V), to contain an implicit temporal limitation that the statute authorizes detention only for "a period reasonably necessary" to accomplish removal.   Zadyvdas, 533 U.S. at 689.   The Supreme Court adopts a "presumptively reasonable" six-month detention period.   Zadyvdas, 533 U.S. at 700-01.   After six months, if the alien can show that removal is not reasonably foreseeable, continued detention becomes unauthorized unless the United States rebuts that showing.   See Zadyvdas, 533 U.S. at 701.   The Supreme Court thus reaffirms that, while Congress possesses broad authority over immigration, this authority remains subject to Constitutional limits once an alien effects an entry and establishes a presence in the United States.[19]

---

[19] In Zadyvdas, the Supreme Court addresses post-removal-order detention as applied to lawful permanent residents who had effected entry into the United States and later lost their admitted status.   See 533 U.S. at 682.   The Court emphasizes that its Due Process analysis rested on the petitioners' prior entry and presence in the United States, noting that "[o]nce an alien enters the country, the legal circumstance changes," because the Due Process Clause applies to all persons within the United States.   Zadyvdas, 533 U.S. at 693. The Court acknowledges that "[a]liens who have not yet gained initial admission to this country would present a very different question."

In Jennings, the Supreme Court considers whether 8 U.S.C. §§ 1225(b), 1226(a), and 1226(c) implicitly requires periodic bond hearings or impose a temporal limitation on detention. See Jennings, 583 U.S. at 289.  Respondent Alejandro Rodriguez, in Jennings, is a lawful permanent resident whom the United States detains under § 1226, because he has several criminal convictions.  See Jennings, 583 U.S. at 289-90.  The United States Court of Appeals for the Ninth Circuit certifies a class of aliens that the United States detains under 8 U.S.C. § 1225(b), 1226(a), and 1226(c) for longer than six months without providing a hearing justifying the detention, and names Rodriguez as the class representative.  See Jennings, 583 U.S. at 290-91.  The Ninth Circuit concludes those provision mandate a bond hearing every six months, invoking the Constitutional avoidance canon, because "prolonged detention without adequate procedural protections' authorized by the provisions 'would raise serious constitutional concerns.'"  Jennings, 583 U.S. at 289 (quoting Rodriguez v. Robbins, 804 F.3d 1060 (9th Cir. 2015), rev'd sub nom. Jennings, 583 U.S. 281).  Justice Alito rejects the Ninth Circuit's use of the Constitutional avoidance canon, holding that the statutory text unambiguously authorizes detention until immigration officers finish considering asylum applications under § 1225(b)(1)(B)(ii) or until removal proceedings conclude under § 1225(b)(2)(A).  See Jennings, 583 U.S. at 283.  Section 1225(b)(1) and (b)(2) state that applicants for admission "shall be detained" pending asylum consideration or removal proceedings, and § 1226(c) similarly provides that the United States "shall" take into custody

---

Zadvydas, 533 U.S. at 682.

      The Supreme Court confronts that unaddressed question in Clark v. Martinez, 543 U.S. 371 (2005)("Clark").  In Clark, the Supreme Court applies Zadvydas' statutory construction to inadmissible aliens whom the United States had never admitted.  Clark, 543 U.S. at 373.  Writing for the Court, Justice Scalia declines to rest the decision on Constitutional Due Process grounds. See Clark, 543 U.S. at 378.  Instead, he reasoned to "give these same words a different meaning for each category [of removable aliens] would be to invent a statute rather than interpret one." Clark, 543 U.S. at 378. Thus, Zadvydas' temporal limitation applies to inadmissible aliens as a matter of statutory interpretation, not because the Due Process Clause independently requires it.

certain criminal aliens and release them from custody "only if" narrow statutory conditions are met. Jennings, 583 U.S. at 283. Because these provisions specify definite termination points and employ mandatory language, the Supreme Court concludes that the statutes are not susceptible to a reading that implicitly imposes periodic bond hearings. See 583 U.S. at 311-12.

In Jennings, the Supreme Court distinguishes Zadvydas, where the Supreme Court previously reads a reasonableness time limit into 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V), to avoid a Constitutional problem. See Jennings, 583 U.S. at 289-99. Justice Alito focuses on the discretionary language "may be detained" in § 1231(a), and the statute containing no explicit endpoint, creating ambiguity. Jennings, 583 U.S. at 299. By contrast, the detention provisions in § 1225 and § 1226 contain clear commands, and, with defined stopping points, leave no comparable textual uncertainty for the avoidance cannon to resolve. See Jennings, 583 U.S. at 300-01. Accordingly, the Supreme Court reverses the Ninth Circuit's judgment, and disagrees with the Ninth Circuit's statutory interpretation and remands the case for consideration of the detainee's Constitutional claims in the first instance, expressly declining to decide whether prolonged detention under these provisions violates the Due Process Clause. Jennings, 583 U.S. at 312.

The third recent Supreme Court cases analyzing due process and the INA is Thuraissigiam. In Thurissigiam, the Supreme Court considers whether 8 U.S.C. § 1252(e)(2)'s limits on review by federal courts of writ of habeas corpus violates either the Suspension Clause or the Due Process Clause. See Thuraissigiam, 591 U.S. at 104.[20] Respondent Vijayakumar Thuraissigiam is a Sri

---

[20] "The Suspension Clause provides that '[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.'" Thuraissigiam, 591 U.S. at 116 (quoting U. S. Const., Art. I, § 9, cl. 2). Because section 1252(e)(2) restricts judicial review in habeas proceedings to whether a petition is an alien, whether the United States orders the petitioner removed, or whether the petitioner can prove they some

Lankan national that crosses the United States' border "without inspection or an entry document," and Border Patrol stops him "within 25 yards of the border." Thuraissigiam, 591 U.S. at 114. The United States detains him and places him in expedited removal proceedings under § 1225(b)(1). See Thuraissigiam, 591 U.S. at 114. Thuraissigiam asserts a fear of returning to Sri Lanka and seeks asylum under § 1225(b)(1)(A)(ii). See Thuraissigiam, 591 U.S. at 114. The United States determines Thuraissigiam does not have a credible fear, and an immigration law judge affirms this determination, placing Thuraissigiam back into removal proceeding. See Thuraissigiam, 591 U.S. at 114.

Thuraissigiam files a petition of a writ of habeas corpus challenging the credible fear determination, but the district court dismisses the petition, because § 1252(a)(2) and (e)(2) remove credible fear determinations from federal courts' jurisdiction under habeas petitions. See Thuraissigiam, 591 U.S. at 115. The Ninth Circuit reverses the district court, because the Ninth Circuit concludes that "§ 1252(e)(2) violates the Suspension Clause." Thuraissigiam, 591 U.S. at 115. The Ninth Circuit states "that respondent 'has procedural due process rights,' specifically the right 'to expedited removal proceedings that conformed to the dictates of due process.'" Thuraissigiam, 591 U.S. at 115 (quoting Thuraissigiam v. U.S. Dep't of Homeland Sec., 917 F.3d 1097 (9th Cir. 2019), rev'd and remanded sub nom. Thuraissigiam, 591 U.S. 103).

Justice Alito, writing for the Court, reverses the Ninth Circuit. See Thuraissigiam, 591 U.S. at 140. He first holds that § 1252(e)(2)'s limits on habeas review do not violate the

_____

type of lawful permanent residence status, see 8 U.S.C. § 1252(e)(2)(A)-(C), the Ninth Circuit finds the provision violates Thuraissigiam's Constitutional rights. See Thuraissigiam v. U.S. Dep't of Homeland Sec., 917 F.3d at 1111, n.15. The Supreme Court reverses the Ninth Circuit's decision, because respondent attempts use of the writ outside its historic role, which in this case is to have the United States make another credible fear determination. See Thuraissigiam, 591 U.S. at 118.

Suspension Clause because the writ, as historically understood at the time of the Founding, does not extend to providing merits review of exclusion decisions.  See Thuraissigiam, 591 U.S. at 118. Turning to due process, the Supreme Court explains that longstanding precedent draws a sharp distinction between aliens who have effected entry and those who seek initial admission.  See Thuraissigiam, 591 U.S. at 138-39.  The Supreme Court reiterates that the Constitution treats an alien whom the United States has not admitted -- whether the United States physically stops them at a port of entry, apprehends them shortly after unlawful entry, or paroles the alien into the country for years -- is, "for due process purposes, as if stopped at the border."  Thuraissigiam, 591 U.S. a 139.  In that posture, the alien "has only those rights regarding admission that Congress has provided by statute."  Thuraissigiam, 591 U.S. at 140. Because Congress specifies the procedures governing credible-fear screening and judicial review of those determinations, the Due Process Clause requires nothing more regarding Thuraissigiam's admission.  See Thuraissigiam, 591 U.S. at 140.  The Supreme Court also emphasizes the structural consequences of adopting the Ninth Circuit's approach.  See Thuraissigiam, 591 U.S. at 139 (stating the rule concerning the United States' plenary power to admit or exclude aliens "would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil").  The Supreme Court thus reaffirms that the political branches retain plenary authority to define the procedures governing admission determinations and that courts may not Constitutionalize additional procedural entitlements in the statue.

Taken together, these cases delineate the Constitutional framework governing immigration detention and admission.  Zadvydas establishes that, once an alien effects entry and establishes presence within the United States, indefinite civil detention raises serious due process concerns absent a realistic prospect of removal.  See Zadvydas, 533 U.S. at 690.  Jennings clarifies that,

where Congress clearly authorizes detention for defined immigration proceedings, courts may not rewrite statutes to impose extra-textual temporal limits, leaving the Constitutional questions -- whether the statute violates the Due Process Clause -- to be addressed directly.  See Jennings, 583 U.S. at 311-12.  Thuraissigiam confirms that aliens whom the United States has not admitted -- whether at the physical border or in the legal posture of as if at the border -- possess only those procedural rights regarding admission that Congress' written statutes provide.  See Thuraissigiam, 591 U.S. at 139.

The distinction between territorial presence and effected entry doctrines resolves any tension among these lines of authority.  Physical presence within the United States generally confers standing on aliens to invoke Constitutional protections, but the entry fiction permits Congress to treat certain physically present aliens like those awaiting inspection or paroled for admission processing as legally remaining at the threshold of entry.  In that posture, procedural entitlements flow from statute rather than from the Due Process Clause.  With this Constitutional framework in view, the Court now turns to § 1225's structure.

## ANALYSIS

The Court carefully reviews the PFRD and the relevant pleadings.  In the TRO PFRD, Magistrate Judge Khalsa recommends that the Court make three conclusions.  See TRO PFRD at 1.  First, she recommends that the Court concludes that Singh has made a strong showing that he is substantially likely to succeed on his first habeas petition claim that his re-detention without a bond hearing violates federal law, because §1226(a), instead of §1225(b)(2), governs Singh's detention.  See TRO PFRD at 6.  Second, she recommends that the Court conclude that Singh has made a strong showing that he is substantially likely to succeed on his second habeas petition claim of a Fifth Amendment of the United States Constitution, U.S. CONST. amend. V, due process

violation, because his re-detention without a bond hearing violates his Fifth Amendment due process rights.  See TRO PFRD at 13.  Finally, she recommends that the Court conclude that the burden of proof at the bond hearing is placed on the United States, because Singh at a previous bond hearing shows under § 1226(a) that he is not a danger or a flight risk and circumstances have not changed between the first bond hearing and Singh's current detention.  See TRO PFRD at 20-21.  Based on these recommendations, Magistrate Judge Khalsa recommends that the Court grant Singh's Motion for Temporary Restraining Order and Preliminary Injunction, filed November 7, 2025 (Doc. 2)("TRO"), and issue a temporary restraining order and preliminary injunction requiring all Respondents to release Singh immediately.  See TRO PFRD at 1.  In the alternative, Magistrate Judge Khalsa recommends that the Court grant Singh's TRO, and require the Respondents to hold a bond hearing within five days of entry of the Court's TRO order, at which the burden is on the United States to show changed circumstances rendering Singh a danger or flight risk, or immediately release him.  See TRO PFRD at 1.  In the Habeas Petition PFRD, Magistrate Judge Khalsa recommends that the Court make two conclusions.  See Habeas Petition PFRD at 1, 13-14.  First, she recommends that the Court conclude that the United States cannot hold Singh under § 1225(b)(2), but instead must hold him under § 1226(a) and afford him a bond hearing.  See Habeas Petition PFRD at 11.  Second, Magistrate Judge Khalsa recommends that the Court permit Singh to file a motion for fees under the EAJA, 28 U.S.C. § 2412(d)(1)(A).  See Habeas Petition PFRD at 13-14.  Based on these recommendations, she recommends that the Court grant Singh's habeas petition in part, and order the Respondents to hold a bond hearing within five days of the entry of the Court's order, and that should they not give him a bond hearing, that the Court then order Respondents to immediately release Singh.  See Habeas Petition PFRD at 14. Pursuant to rule 72(b) of the Federal Rules of Civil Procedure, the Court conducts a de novo review

of the record and all parts of the Magistrate Judge Khalsa's PFRD to which the Federal

Respondents properly object. The Federal Respondents object to all recommendations in both the

TRO PFRD and the Habeas Petition PFRD. See generally TRO PFRD Objections; Habeas Petition

PFRD Objections. After conducting this de novo review, the Court concludes that there are sound

reasons in the applicable law and the relevant facts to sustain the Objections to Magistrate Judge

Khalsa's recommended dispositions and accordingly declines to adopt the PFRD's

recommendations.

I.    **THE COURT SUSTAINS THE RESPONDENTS' OBJECTION TO MAGISTRATE JUDGE KHALSA'S CONCLUSIONS IN BOTH THE TRO PFRD AND THE HABEAS PETITION PFRD THAT 8 U.S.C. § 1226(a) GOVERNS SINGH'S DETENTION, AND THAT SINGH THEREFORE IS ENTITLED TO EITHER <u>IMMEDIATE RELEASE OR A BOND HEARING</u>.**

The Federal Respondents argue that Singh is subject to mandatory detention under §

1225(b)(2), because he is an alien present in the United States without having been admitted

lawfully to the United States, and that therefore the Court should not grant Singh either immediate

release or a bond hearing. See TRO PFRD Objections at 2; Habeas Petition PFRD Objections at

1. The Court concludes that the Federal Respondents are correct in concluding that  they can hold

Singh under § 1225(b)(2). The Court determines that the United States may not properly detain

Singh under 8 U.S.C. § 1225(b)(1)(ii), which provides for mandatory detention, even though he is

an alien who has been present in the United States continuously for less than two years immediately

before the date of the determination of inadmissibility, he has not been admitted or paroled, he has

filed a claim for asylum, and immigration officers have determined that he is not entitled to be

admitted. See 8 U.S.C. § 1225(b)(1)(ii). This does not prevent the Court, however, from

sustaining the Federal Respondents' Objection to Magistrate Judge Khalsa's recommendation that

the Court order the United States to give Singh a bond hearing or to immediately release Singh,

because Singh is still subject to mandatory detention under § 1225(b)(2), and the United States is not holding Singh under § 1226(a).

While removal proceedings are adjudicated, the United States may detain an alien pursuant to 8 U.S.C. § 1225 or § 1226.  Section 1225(b)(1) applies to "applicants for admission" who "arrive" in the United States, or who have been in the United States continuously for less than two years, and Section 1225(b)(2) applies to "other aliens" that are applicants for admission seeking admission.  See 8 U.S.C. § 1225(a)(1), (b)(1)(A)(iii); Jennings, 583 U.S. at 287-89; Thuraissigiam, 591 U.S. at 108-09.  The Court agrees with the United States that it may detain Singh with mandatory detention under § 1225, and concludes that the United States relies on the right provision.  The Court concludes that the United States may properly detain Singh under § 1225(b)(2).

The relevant language of 8 U.S.C. § 1225(b)(1) states:

**(b)     Inspection of Applicants for Admission**

> (1)     Inspection of aliens arriving in the united states and certain other aliens who have not been admitted or paroled
>
> > (A)     Screening
> >
> > > (i)      In General –
> > > If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or fear of persecution.
> > >
> > > (ii)     Claims for Asylum –

If an immigration officer determines that an alien (other than an alien described in subparagraph (F)) who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title and the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer under subparagraph (B).

(iii)    Application to Certain Other Aliens

(I)    In General –
The Attorney General may apply clauses (i) and (ii) of this subparagraph to any or all aliens described in subclause (II) as designated by the Attorney General. Such designation shall be in the sole and unreviewable discretion of the Attorney General and may be modified at any time.[21]

(II)    Aliens Described –
An alien described in this clause is an alien who is not described in subparagraph (F), who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year

---

[21] On January 21, 2025, the Acting Secretary of Homeland Security extends expedited removal nationwide to encompass all persons who, upon detention, cannot prove their continuous presence in the United States during the preceding two years. See Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139, 8,140 (Jan. 24, 2045)(effective date Jan. 21, 2025). Although § 1225(b)(1)(A)(iii)(I) references only the Attorney General, Congress has transferred this power to expand expedited removal to certain other aliens to the Secretary of Homeland Security. See 8 U.S.C. § 1103(a); 6 U.S.C. § 251; Clark v. Martinez, 543 U.S. 371, 374 n.1 (2005).

> period immediately prior to the date of the determination of inadmissibility under this subparagraph.

8 U.S.C. § 1225(b)(1).

The relevant language of 8 U.S.C. § 1225(b)(2) states:

(A)    In General --
Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

(B)    Exception- Subparagraph (A) shall not apply to an alien --

(i)    who is a crewman,

(ii)    to whom paragraph (1) applies, or

(iii)    who is a stowaway.

8 U.S.C. § 1225(b)(2).  Section § 1225(b)(1) is the default provision for § 1225, and the majority of aliens whom the United States properly may hold under § 1225 will fall within its scope; that is, aliens qualifying as applicants for admission who either arrive at the border, and are inadmissible because of fraud, misrepresentation, or lack of valid documentation, or aliens who are present in the country continuously for less than two years immediately before the date of the determination of inadmissibility, and are inadmissible because of fraud, misrepresentation, or lack of valid documentation.  See 8 U.S.C. §§ 1225(b)(1)(A)(i)(citing §§ 1182(a)(6)(C), (a)(7)), (b)(1)(A)(ii)).  Section 1225(b)(1)(A)(iii), which applies to aliens present in the country continuously for less than two years, applies only to aliens whom the United States has not been admitted or paroled into the country.  See 8 U.S.C. § 1225(b)(1)(A)(iii).  Congress defines admission and admitted as "the lawful entry of the alien into the United States after inspection and

authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). Section 1182(d)(5) governs

parole; it authorizes the Secretary of Homeland Security, "in his discretion," to parole aliens

applying for admission to the United States "on a case-by-case basis for urgent humanitarian

reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). Importantly, release on an alien's

"own recognizance" pursuant to § 1226, termed conditional parole, does not qualify as the parole

that exempts an alien from the scope of §1225(b)(1)(A)(iii).

> In 1996 Congress amended INA § 212(d)(5)(A), [codified at 8 U.S.C. §
> 1182(d)(5)(A)], to allow parole "only on a case by case basis for urgent
> humanitarian reasons or significant public benefit. . . . [I]n 2007 the DHS Office of
> the General Counsel opined that release of a detained noncitizen under INA §
> 236(a)(2), [codified at 8 U.S.C. § 1226(a)(2)(B),] is not equivalent to parole under
> INA § 212(d)(5)(A). The BIA affirmed this interpretation in 2023.

Gordon, Mailman, Yale-Loehr, Immigration Law and Procedure § 62.01[3], at 62-17, 62-

19 (2025 ed.)("Gordon").

Turning to § 1225(b)(2), this provision is a "catchall provision." Jennings, 583 U.S. at 287

("Section 1225(b)(2) is broader. It serves as a catchall provision that applies to all applicants for

admission not covered by § 1225(b)(1)"). This provision is not a catchall such that it covers every

applicant for admission, including all applicants for admission who have been present in the

interior for more than two years, as the United States understands the provision. Instead, this

provision is cabined within § 1225(b)'s broader "inspection" purpose, and is limited to "aliens

seeking entry into the United States (applicants for admission in the language of the statute)" who

do not fall within § 1225(b)(1)'s scope. Jennings, 583 U.S. at 297. This group of "other aliens"

includes arriving aliens and aliens present in the United States for less than two continuous years

who are inadmissible under some provision other than §§ 1182(a)(6)(C), (a)(7) who seek

admission, as well as aliens present in the interior of the United States for longer than two

continuous years who seek admission, such as applying to achieve some legal status. In reaching

this conclusion, the Court highlights that § 1225(b)(2)(B) states that any alien "to whom paragraph (1) applies," paragraph (1) being § 1225(b)(1), is not subject to § 1225(b)(2)(A), the catchall provision.  8 U.S.C. § 1225(b)(2)(B).  This express exclusion emphasizes § 1225(b)(2)(A)'s limited scope and that the majority of aliens whom the United States detains under § 1225 should be detained under § 1225(b)(1).

In determining whether the United States correctly detains Singh under § 1225(b)(2), therefore, the Court first must look to whether the United States properly can detain him under § 1225(b)(1).  The Court determines that the United States may not detain Singh under § 1225(b)(1); the United States does not detain Singh at the border as an "arriving" alien, and although the United States detains Singh the second time before he has been present in the United States continuously for two years, the immigration officer determines Singh to be inadmissible under § 1182(a)(6)(i), which is not the two inadmissibility provisions, §§ 1182(a)(6)(C), (a)(7), that § 1225(b)(1) requires to be applicable.  Magistrate Judge Khalsa concludes that, "by the time [Singh] is re-detained, [Singh] had been residing in the United States for two years."  TRO PFRD at 9.  The Court is uncertain how Magistrate Judge Khalsa reaches this conclusion.[22]  The facts demonstrate that

---

[22] The Court acknowledges that, after the date of his most recent detention on September 4, 2025, up to the current day, Singh has been present in the United States for more than two years. The date that determines the eligibility of an alien to be held under § 1225(b)(1)(A)(iii), however, is the date of detainment, when the determination of inadmissibility is made. See 8 U.S.C. § 1225(b)(1)(A)(iii)(explaining that an alien "who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility of under this subparagraph," is subject to § 1225(b)(1)(A)(iii).  The determination of inadmissibility references § 1225(b)(1)(A)(i), which gives the general procedure for § 1225(b)(1)(A) and states: "If an immigration officer determines that an alien . . . who is arriving in the United States or is described in clause (iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed from the United States . . . . ").  That Singh has now been present in the United States for more than two years, because time has elapsed during his detainment, does not mean that Singh is no longer eligible to be held under § 1225(b)(1)(A)(iii).  Because Singh is present in the United States continuously for less than two

Singh first arrives in the United States on September 15, 2023.  See PFRD at 2.  The United States then re-detains Singh on September 4, 2025, while Singh is traveling through a United States Border Patrol checkpoint in New Mexico. See PFRD at 2.  These dates indicate continued presence in the United States for a time period of less than two years.  Accordingly, Singh is present in the United States for less than two continuous years at the time of his challenged detainment, he is subject therefore to the expedited removal proceedings, and the United States properly holds him under § 1225(b)(1), if the other provisions of § 1225(b)(12) are met.  That the United States previously detains Singh and releases him on his own recognizance under §1226 does not negate § 1225(b)(1)'s applicability; this interaction neither admits nor paroles Singh into the United States, as § 1225(b)(1)(A)(iii) uses these terms.  Admission requires that Singh crossed the border in accordance with procedural regularity, which he does not do.  See Matter of Quilantan, 25 I. & N. Dec. 285, 290 (BIA 2010). Singh does not present himself at a port of entry, but instead crosses the border at an unauthorized location and is later picked up and detained by immigration officials. See PFRD at 2; Notice at 1.  He is then released under § 1226(a), under conditional parole, which the Court has already concluded above does not constitute "parole" within the meaning of § 1225(b)(1)(A)(iii) sufficient to remove him from the scope of the provision.  Further, upon his release from his initial detainment under § 1226, Singh is presented with a Notice to Appear which states explicitly that he "arrived in the United States at or near Lukeville, Arizona, on or about September 15, 2023 . . . [and was] not then admitted or paroled after inspection by an Immigration Officer."  See Notice at 1.

---

years on the date that an immigration officer detains him  and determines him to be inadmissible, September 4, 2025, the Court determines that the United States may detain Singh under § 1225(b)(1)(A)(iii), if the other provisions of § 1225(b)(1) are met.

The problem with applying § 1225(b)(1) is that the immigration officer at neither stop relies on § 1182(a)(6)(C) or § 1182(a)(7), as § 1225(b)(1)(A)(i) requires. Both times, the immigration officer relies on § 1182(a)(6)(A)(i). The first time, this looks like an intentional move to keep § 1225(b)(1)(A)(i) from applying. In any case, in the second detainment, the immigration also makes it clear that he too is relying on § 1182(a)(6)(A)(i). Thus, both immigration officers' determinations make clear that § 1225(b)(1)(A)(i) does not apply. Despite Singh satisfying all other requirements of § 1225(b)(1), therefore, the immigration officers' do not allow the expedited removal in § 1225(b)(1).

Given that § 1225(b)(1) does not apply to Singh, § 1225(b)(2) may apply. Singh meets all of the requirements for § 1225(b)(2). First, he is an applicant for admission. While he is no longer an arriving alien, he is "[a]n alien present in the United States who has not been admitted . . ." 8 U.S.C. § 1225(a)(1). Second, from all of the examining immigration officer's remarks and documents, they have determined that the evidence does not show "clearly and beyond doubt" that Singh is "entitled to be admitted."[23] 8 U.S.C. § 1225(b)(2). The officer found that he is not

---

[23] Congress writes what the examining immigration officer has to determine in a challenging way: "determines than an alien seeking admission is not clearly and beyond a doubt entitled to be admitted . . . ." 8 U.S.C. § 1225(b)(2). The issue is whether the officer has to determine whether the alien seeking admission is not to be admitted or whether the alien is to be admitted. If the reader eliminates the standard "clearly and beyond a doubt" from the sentence, the officer has to determine that the alien is "not . . . to be admitted." If "not" is part of the standard, the officer has to determine whether the "alien . . . is . . . entitled to be admitted."

If the officer must determine whether the alien is "entitled to be admitted," the officer would have to determine -- "not clearly and beyond a doubt" that the alien "is entitled to be admitted." That construction would not make sense. "Not" thus cannot be part of the standard, but perhaps is part of the determination. This other construction would be that the officer must determine "clearly and beyond a doubt" that the alien is "not . . . entitled to be admitted." That construction also does not make sense. This construction would be an impossibly high standard on the officer, and he would have to admit every alien.

Guidance is found in § 1229a(c), where Congress puts the burden on the alien. See 8 U.S.C. § 1229a(c)(2)(A). The alien has the burden of proof that he or she "is clearly and beyond a doubt entitled to be admitted." U.S.C. § 1229a(c)(2)(A). In § 1225(b)(2), by putting the not in

lawfully present in the United States.  Undisputed facts kept the officers from finding that he is "entitled to be admitted."  Border Patrol Agent Delgado reports that Singh states "that he had entered illegally through Arizona." Record of Deportable/Inadmissible Alien at 1.  Delgado further notes that Singh has a pending removal proceeding before EOIR.[24]  At the time Singh is placed into detention, he also has a pending asylum application.  An alien who admits unlawful entry is subject to ongoing removal proceedings, and seeks relief from removal cannot, by definition, be clearly and beyond a doubt entitled to admission.  Because Singh is an applicant for admission and the immigration officer does not find that Singh is admissible, the immigration officer also find that he is not "clearly and beyond a doubt" admissible or "clearly and beyond a doubt" entitled to be admitted, § 1225(b)(2) applies by its plain terms. Finally, the Court concludes that Singh is seeking admission.  The Court disagrees with the Federal Respondents' position that every

---

front of the standard, Congress is saying that the officers has to find that the alien is not "clearly and beyond a doubt entitled to be admitted."  8 U.S.C. § 1225(b)(2)(A).  Not is a finding that the evidence does not show that high standard.  Thus, the immigration officer has to determine that, on the record before the officer, the evidence does not show "clearly and beyond doubt" that the alien is entitled to be admitted.  The conclusion is similar to one that the evidence is not beyond a reasonable doubt.

The word "not" does important work in this sentence.  Under the ordinary-meaning canon, words are given their common, everyday meaning unless the statute indicates otherwise.  See Scalia & Garner, Reading the Law: The Interpretation of Legal Texts at 69.  Here, "not" negates the demanding standard that follows.  Congress does not require the officer to determine that the alien is affirmatively inadmissible or unlawfully present; it required only a determination that the alien fails to meet the exceptionally high threshold of being "clearly and beyond a doubt" entitled to admission.

The rule against surplusage reinforces this reading.  See Scalia & Garner, supra at 174.  If "not" is read narrowly or treated as requiring proof of unlawful presence, the phrase "clearly and beyond a doubt" does no work.  Congress chose a stringent entitlement standard and then made detention mandatory whenever that standard is not satisfied.  In short, once any genuine doubt exists as to entitlement to admission, the statute commands detention.  That is what "not" accomplishes in § 1225(b)(2).

[24] EOIR hearings are immigration court proceedings where individuals face removal or deportation.

applicant for admission is seeking admission and therefore subject to the scope of § 1225(b)(2). See Objections to the TRO PFRD at 2. This argument improperly equates the term "applicant for admission" and "alien seeking admission" in § 1225(b)(2)(A). Treating these phrases synonymously is contrary to the presumption that Congress intends different words or phrases to be accorded different meanings. Seeking admission, therefore, must mean something different than applicant for admission, and therefore does not apply to every alien present in the United States who has not been admitted. The Court also disagrees, however, with Magistrate Judge Khalsa's conclusion that "seeking admission" must only apply to aliens at the border, and cannot apply to aliens present in the United States. This conclusion equates the phrase "seeking admission" with an "arriving alien," someone showing up at the United States' borders looking to enter the country. Congress uses the phrase "arriving alien" in § 1225(b)(1), however, demonstrating that Congress knew how to use the phrase when it intended for a provision to apply to arriving aliens. Treating these phrases synonymously, therefore, is also contrary to the presumption that Congress intends different words or phrases to be accorded different meanings. Magistrate Judge Khalsa relies on the conclusion that an alien, such as Singh, who already has entered the United States, is no longer seeking admission because admission is defined as "lawful entry." Lawful entry, however, means more than just physical presence in the United States, and it is entirely possible that an alien can be present in the United States without having effected lawful entry. Admission requires at minimum "procedural regularity" with entry procedures. See Matter of Quilantan, 25 I. & N. Dec. 285, 290 (BIA 2010). An alien, such as Singh, who crosses over the border without presenting himself at a lawful point of entry for inspection cannot, therefore, be considered admitted into the country, and therefore an alien in the interior of the country can still be seeking admission. The Court instead believes that seeking admission is

something active that an alien must engage; an alien must request admission into the United States. This seeking can occur at the border, by an arriving alien who requests admission at a lawful point of entry; this seeking can also occur in the interior of the United States, however, when an alien who has not been admitted, an applicant for admission, makes some attempt to gain lawful admission, such as filing for an asylum or a visa.  The Court believes that this interpretation does not run counter to Justice Alito's language in Jennings that "§ 1225(b) applies primarily to aliens seeking entry into the United States ('applicants for admission' in the language of the statute.)." Jennings, 583 U.S. at 297.  The modifier "primarily" implies that § 1225(b) also reaches some aliens who are not seeking entry.  "Applicants for admission" means aliens present in the United States who have not been admitted or who arrive in the United States, and § 1225(b)(2) requires that the alien be an applicant for admission.  Aliens physically present within our borders, whom the United States has not admitted, are not "seeking entry," but instead are "seeking admission." 8 U.S.C. § 1225(b)(2)(A) (referring to an "alien seeking admission").  Justice Alito's further statement that "§ 1226 applies to aliens already present in the United States" creates no tension in Justice Alito's two statements; both of Justice Alito's propositions coexist comfortably and are consistent with the Court's reading of § 1225(b), which recognizes that § 1225 at the border, and, in some cases, in the interior.  The Court therefore understands Singh, an alien present in the United States who has filed an asylum application, to be seeking admission, and can be properly held under § 1225(b)(2).

After his illegal entry on September 15, 2023, but before his second detainment on September 4, 2025, however, Singh timely files an application for asylum, withholding of removal, and protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.  See PFRD at 2.  Singh's asylum application remains pending, with his

next master calendar hearing set for January 20, 2025.  See PFRD at 2.  The Court understands

that this hearing is a Final Preliminary Hearing, which is the rough equivalent of a court's pretrial

conference before trial.  In other words, the next hearing for Singh will be his final asylum hearing.

Given that Singh has had multiple hearings -- and continues to have hearings -- on his asylum

application, the Court presumes that the United States finds Singh to have a credible fear of

persecution.  The United States may detain an alien seeking asylum under § 1225(b).  Under 8

C.F.R. § 235.3, "aliens over whom USCIS exercises jurisdiction pursuant to § 208.2(a)(1)(ii) [8

U.S.C. § 1158] of this chapter after being found to have a credible fear of persecution or torture

shall be detained in accordance with section 235(b) [8 U.S.C. § 1225(b)] of the Act."  8 C.F.R. §

235.3(c)(2).  Section 1158 establishes asylum interview procedures for aliens present in the United

States who have filed an asylum application.  Read together, these provisions indicate that the

United States may detain aliens present in the United States who apply for asylum and whom the

United States finds to have a credible fear pursuant to INA § 235(b), codified at 8 U.S.C. § 1225(b).

If the asylum seeker is an "other alien" in § 1225(b)(2), then he shall be detained for a proceeding

under section 1229(a) of this title.  8 U.S.C. § 1225(b)(2)(A).   The Court concludes, therefore,

that Singh's asylum application does not negate the ability of the United States properly to  detain

Singh under § 1225(b)(2).  The Court therefore sustains the Federal Respondents' Objection,

because the United States may detain Singh under § 1225(b)(2), and the United States does not

hold Singh under § 1226(a), as Magistrate Judge Khalsa concludes, which entitles Singh either to

immediate release or a bond hearing.

## II.    THE COURT SUSTAINS THE RESPONDENTS' OBJECTION TO MAGISTRATE JUDGE KHALSA'S CONCLUSION IN THE TRO PFRD THAT SINGH'S DETENTION VIOLATES SINGH'S FIFTH AMENDMENT DUE PROCESS RIGHTS.

The Federal Respondents argue that Singh does not make a strong showing that he will

succeed on his claim that the United States violates his Fifth Amendment Due Process rights,

because the United States appropriately detains Singh under § 1225(b)(2) and because he is entitled only to the due process rights that the statute afford him.  See TRO PFRD Objections at 5.   The Court disagrees with this argument.  The Fifth Amendment affords Singh substantive due process protections, independent from the process § 1225 affords, that unreasonably prolonged detention while his asylum claim is pending may trigger.  The Court concludes, however, that the current length of Singh's detention, which begins on September 4, 2025, is not long enough to constitute unreasonably prolonged detention.  The Court therefore sustains Respondents' Objection and denies Singh's habeas petition without prejudice, thus giving him the opportunity to refile should his detention reach the status of unreasonably prolonged detention.

The Constitution does not apply equally to citizens and aliens within the United States borders.  Indeed, the Supreme Court "has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." Demore v. Kim, 538 U.S. 510, 522 (2003).  The understanding of what due process affords an alien begins with a discussion of the distinction between territorial standing and the entry fiction.  See Gordon, supra § 9.04, at 9-15.  Territorial standing is the idea that an alien's physical presence in the United States, even if the alien enters illegally, functions as a proxy for ties to the country -- ties sufficiently strong to confer on the alien standing to assert a range of Constitutional rights that an alien who has not "made an entry" may not claim.  E.g., United States v. Verdugo-Urquidez, 494 U.S. 259, 273-75 (1990)(concluding that undocumented aliens who voluntarily enter the United States presumably have accepted some societal obligations, whereas those whom the United States transports here have no voluntary connection with the country that might place them among the United States people for purposes of the Fourth Amendment's protection).  By contrast, the entry fiction is the idea that an alien on United States soil pending admission is under the law regarded

as still at the border -- regardless of their length of stay and ties to the community -- and thus beyond the Constitution's protection, which protects only those who have effected entry.  See, e.g., Leng May Ma v. Barber, 357 U.S. 185, 190 (1958)(explaining that parole does not alter the excluded alien's status or otherwise bring her "within the United States," and thereby entitle her to the benefits of a deportation hearing);   Chin Yow v. United States, 208 U.S. 8, 12-13 (1908)("[T]he petitioner gains no additional right of entrance by being allowed to pass the frontier in custody for the determination of his case.").  Put differently, the rule of territorial standing presumes that aliens who reach United States soil under their own power -- legally or illegally -- have ties to the community sufficient to confer a wide range of Constitutional rights.  See Gordon, supra § 9.04, at 9-15.  This presumption encompasses aliens who cross the border illegally without ever encountering law enforcement.  The entry doctrine, by comparison, concludes that aliens whom the United States permits into the country absent some legal right to be there -- e.g., paroled -- have no community ties, and, therefore, relatively few rights.  See Gordon, supra § 9.04, at 9-15.

This distinction has its historical basis in the old immigration processes of exclusion and deportation, wherein exclusion is the administrative process that affords an alien whom the United States concludes cannot enter the United States the opportunity to show why the United States should grant entry.  See Gordon, supra § 9.05[1], at 9-18.  Deportation, by contrast, is the procedure by which the United States expels an alien who already entered the country, whether legally or illegally.   See Gordon, supra § 9.05[1], at 9-18.   Aliens in exclusion proceedings have few Constitutional rights.  Because of the entry fiction, the law deems aliens in exclusion proceedings to be beyond the United States' borders and therefore largely ineligible for the protection of United States domestic laws.   See Gordon, supra § 9.05[1], at 9-18.  The aliens' only protections are those

that the federal statute grants.  See Gordon, supra § 9.05[1], at 9-18.  The law deems deportable aliens to be in the country, by contrast, because of the rule of territorial standing, and therefore to have developed ties to the country sufficient to warrant a range of due process and equal protection rights.  See Gordon, supra § 9.05[1], at 9-18.  The Supreme Court in Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953)("Mezei"), maintains this distinction, and the Supreme Court acknowledges the difference between the Constitutional protections that the United States affords to aliens who have territorial standing versus what the law affords aliens who have not effected entry into the United States:

> It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming traditional standards of fairness in due process of law.  But an alien on the threshold of initial entry stands on a different footing: 'Whatever the procedure authorized by Congress, it is due process as far as an alien denied entry is concerned.'

345 U.S. at 212 (quoting United States ex rel Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950)). Congress erases the distinction between exclusion and deportation proceedings when it passes the IIRAIRA in 1996, collapsing the two proceedings into a single "removal" proceeding.  See Gordon, supra § 9.05[1], at 9-18.  The Supreme Court in Thuraissigiam confirms, however, that the entry fiction still applies when determining what due process rights to afford to aliens.  See 591 U.S. at 138-40.  The petitioner makes it twenty-five yards into the United States before apprehension and, on the basis of this presence into the United States, argues that the United States should afford him greater due process protections.  See Thuraissigiam, 591 U.S. at 139.  Justice Alito, writing for the Supreme Court, rejects this argument.  See Thuraissigiam, 591 U.S. at 139.  Speaking of the rule regarding the due process rights of an alien seeking initial entry, Justice Alito states:

> This rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil.  When an alien arrives at a port of entry -- for example, an international airport  -- the alien is on U.S. soil, but the alien is not considered to have entered the country for the purposes of this rule.  On the

contrary, aliens who arrive at ports of entry -- even those paroled elsewhere in the country for years pending removal -- are "treated" for due process purposes "as if stopped at the border.

Thuraissigiam, 591 U.S. at 139 (citing Leng May Ma v. Barber, 357 U.S. at 188-90;  Mezei, 345 U.S. at 215; Kaplan v. Tod, 267 U.S. 228, 230-31 (1925)).  Similarly, the Supreme Court reaffirms the "entry fiction" doctrine in Zadvydas, 533 U.S. 678 (2001)("Zadvydas"):

> The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.  See Kaplan v. Tod, 267 U.S. 228, 230 (1925)(despite nine years' presence in the United States, an "excluded" alien "was still in theory of law at the boundary line and had gained no foothold in the United States"); Leng May Ma v. Barber, 357 U.S. 185, 188-90 (1958)(alien "paroled" into the United States pending admissibility had not effected an "entry").  It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographical borders.  See United States v. Verdugo-Urquidez, 494 U.S. 259, 269 (1990)(Fifth Amendment's protections do not extend to aliens outside the territorial boundaries); Johnson v. Eisentrager, 339 U.S. 763, 784 (1950)(same).  But once an alien enters the country, the legal circumstances change, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

 Zadvydas, 533 U.S. at 693.  The Tenth Circuit also embraces this concept.  See Sierra Immigr. & Naturalization Serv., 258 F.3d 1213, 1218 (10th Cir. 2001)("Sierra")("Although he has been physically present in the United States for more than twenty years, Sierra is 'legally considered to be detained at the border and hence as never having effected entry into this country.'")(quoting Gisbert v. U.S. Attorney Gen., 988 F.2d 1437, 1440 (5th Cir.), amended by 997 F.2d 1122 (5th Cir. 1993)).  The Court therefore understands this distinction between an alien subject to territorial standing and one subject to the entry fiction still to impact the extent of due process rights that the United States affords an alien.

There are two cases that inform the Court's understanding of the Tenth Circuit's approach to due process rights that the Constitution affords to arriving aliens: Rodriguez-Fernandez v. Wilkinson, 654 F.2d 1382 (10th Cir. 1981)("Rodriguez-Fernandez"), and Sierra.  Rodriguez-

Fernandez involves a Mariel Cuban[25] who arrives at Key West, Florida, aboard the Freedom Flotilla, and, based on Rodriguez-Fernandez's criminal record and lack of immigration documents, immigration officers deem Rodriguez-Fernandez not entitled to enter and detain him pursuant to § 1225(b).  See 654 F.2d at 1384.  An immigration officer subsequently orders him deported.  See 654 F.2d at 1384.  Cuba refuses to accept him, however, and Rodriguez-Fernandez remains in custody despite the inability of the United States to find a country that will accept him.  See 654 F.2d at 1384.  In ordering his release, the Tenth Circuit notes that "an excluded alien in physical custody within the United States may not be 'punished' without being accorded the substantive and procedural due process guarantees of the Fifth Amendment." Rodriguez-Fernandez, 654 F.2d at 1387.  The Tenth Circuit reasons that the United States cannot order Rodriguez-Fernandez' execution -- the ultimate denial of liberty under the Fifth Amendment -- solely because Cuba will not accept him.  See 654 F.2d at 1387.  There is little chance that the United States will ever release Rodrigez-Fernandez; the United States continues to detain him long after Cuba refuses to accept him, and the Tenth Circuit concludes that such detention "has become imprisonment" in violation of the Due Process Clause.  Rodriguez-Fernandez, 654 F.2d at 1387.  The Tenth Circuit concludes that the detention of aliens after proceedings necessary to determine eligibility to enter the country is permissible only during "a reasonable period of negotiations for their return to the country of origin" and that, after such a time, the United States must release the alien.  654 F.2d at 1389-90.  Rodriguez-Fernandez therefore suggests that the United States cannot indefinitely detain aliens on the threshold of entry without running afoul of the Due Process Clause.

---

[25] Mariel Cubans are those who attempted to enter the United States in 1980 when "some 125,000 Cuban aliens arrived without visas in Florida aboard a flotilla of small boats," Palma v. Verdeyen, 676 F.2d 100, 101 (4th Cir. 1982), often referred to as the "Freedom Flotilla." Rodriguez-Fernandez, 654 F.2d at 1383.

Sierra also involves a Mariel Cuban's attempt to enter the United States. See 258 F.3d at 1215-16. After the United States denies Sierra entry, the United States paroles him into the United States. See 258 F.3d at 1216. While on parole, Sierra is convicted of several crimes, prompting the Immigration and Naturalization Service ("INS") to deny his application to become a lawful permanent resident. See 258 F.3d at 1216. An immigration judge then denies his application for asylum and orders Sierra deported, at which point Cuba refuses to accept him. See 258 F.3d at 1216. Sierra applies for parole during his post-conviction detention, the right to which 8 C.F.R. § 212.12(g)(2) affords him because of his status as a Mariel Cuban, and the United States grants parole; six months later, however, the United States revokes his parole. See 258 F.3d at 1216. None of Sierra's later requests for parole succeed. See 258 F.3d at 1216. Sierra then files a habeas petition challenging the decisions to deny him parole under the Due Process Clause. See 258 F.3d at 1216. The Tenth Circuit begins its analysis by emphasizing Sierra's status as an arriving alien: "Although he has been physically present in the United States for more than twenty years, Sierra is 'legally considered to be detained at the border and hence as never having effected entry into this country.'" 258 F.3d at 1218 (quoting Gisbert v. U.S. Attorney Gen., 988 F.2d 1437, 1440 (5th Cir.), amended by 997 F.2d 1122 (5th Cir. 1993)). As an alien subject to the entry fiction, "[t]he Due Process Clause does not provide [Sierra] a liberty interest in being released on parole. Ordinarily, then '[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" 258 F.3d at 1218 (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544 (1950)). In a footnote, the Tenth Circuit clarifies that this "rule applies to procedural due process challenges such as Sierra's." 258 F.3d at 1218 n. 3. The Tenth Circuit distinguishes procedural due process challenges from substantive due process challenges to Congressional legislation by citing to the warning in Rodriguez-Fernandez that "Congress could

not order the killing of Rodriguez-Fernandez and others in his status on the ground that Cuba would not take them back." Sierra, 258 F.3d at 1218 n. 3 (quoting Rodriguez-Fernandez, 654 F.2d at 1287). Because Sierra receives the process that the relevant parole regulation gives him, and his Fifth Amendment procedural due process rights are coextensive with the process under the parole regulations, the Tenth Circuit holds that his challenge to his detention under the Due Process Clause fails. See Sierra, 258 F.3d at 1218-20.

Based on the above precedent, therefore, the Court understands the Tenth Circuit's approach to the due process rights of an alien subject to the entry fiction, as follows: The Tenth Circuit continues to follow Mezei's holding that the procedure which Congress authorizes for aliens subject to the entry fiction is due process; in other words, an alien subject to the entry fiction's procedural rights under the relevant statutes are coextensive with the alien's Fifth Amendment's procedural due process rights. An alien subject to the entry fiction also has, however, substantive due process rights which extend beyond the procedural protections that Congress provides in the statute. The Court further concludes that Singh, an inadmissible alien that the United States catches at the border, whom the United States then allows into the United States under his own recognizance pursuant to the United States' § 1226(a) power, qualifies as an alien subject to the entry fiction who has not effected entry into the United States successfully. As a consequence, the United States must afford Singh only the procedural due process protections that the United States affords to aliens at the border, who have not entered into the United States -- that is, whatever procedures Congress affords under the statute.

Looking at the procedural protections that § 1225 affords, the Court first notes that the Supreme Court states in Jennings that § 1225 does not contain any additional process other than what the statute grants. See Jennings, 583 U.S. at 297-301. Justice Alito in Jennings declines to

follow the approach that the Supreme Court takes in <u>Zadvydas</u>, 533 U.S. 678 (2001), where the Supreme Court holds that, for "aliens admitted to the United States but subsequently ordered removed," § 1231(a)(6) contains an implicit "reasonable time" limitation on detention; the United States may detain an alien beyond the ninety-day "removal period" only for such time as is reasonably necessary to secure the alien's removal, and detention may not continue if removal is "no longer practically attainable." <u>Zadvydas</u>, 533 U.S. at 682, 690. The Supreme Court reads this implicit limitation into § 1231 under the Constitutional avoidance canon, because "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem," and "post-removal-detention, unlike detention pending a determination of removability . . . has no obvious termination point." <u>Zadvydas</u>, 533 U.S. at 690, 697. Important to the Supreme Court's determination is the fact that the petitioners are aliens who have effected entry into the country, and, therefore, the Supreme Court affords them full Constitutional protections:

> We deal here with aliens who were admitted into the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question. Based on our conclusion that indefinite detention of aliens in the former category would raise serious constitutional concerns, we construe the statute to contain an implicit 'reasonable time' limitation   . . . .

<u>Zadvydas</u>, 533 U.S. at 682. In <u>Jennings</u>, however, Justice Alito relies on the fact that, unlike § 1231, § 1225(b) has a definite termination point for detention -- the conclusion of removal proceedings. <u>See</u> 583 U.S. at 299. Justice Alito concludes that, because § 1225(b) "mandate[s] detention until a certain point and authorize[s] release prior to that point only under limited circumstances," the Supreme Court cannot reasonably read § 1225(b) to impose a limit on the length of detention before the removal proceedings' conclusion. <u>Jennings</u>, 583 U.S. at 297-303. <u>Jennings</u> does not foreclose, however, the possibility that an alien has due process rights which the Constitution affords separate and apart from the statute's protections. <u>See</u> 583 U.S. at 312.

The Court determines, therefore, that the only procedural rights that Singh has is what §
1225 affords and therefore that continued detention without a bond hearing does not violate his
procedural due process rights.  Based on the Tenth Circuit's conclusion in Rodriguez-Fernandez,
however, the Court concludes that Singh has substantive due process protections that extend
beyond § 1225's protections.  The United States may violate an alien subject to the entry fiction's
substantive due process rights if immigration detention becomes punitive.  See Rodriguez-
Fernandez, 654 F.2d at 1387 ("[A]n excluded alien in physical custody within the United States
may not be 'punished' without being accorded the substantive . . . due process guarantees of the
Fifth Amendment.").  Nevertheless, "the mere fact that a person is detained does not inexorably
lead to the conclusion that the government has imposed punishment."  United States v. Salerno,
481 U.S. 739, 746 (1987).  A restriction on liberty is punitive rather than regulatory if (a) the
government intends to impose punishment, or (b) the restriction is not rationally related to a
legitimate nonpunitive governmental purpose or is excessive in relation to that purpose.  See
United States v. Salerno, 481 U.S. at 747;  Kingsley v. Henderson, 576 U.S. 389, 398 (2015).  The
Court determines that Singh cannot demonstrate, at this time, that his detention is so long that it
has crossed over into punishment and a violation of his due process rights.  First, Singh provides
no evidence that his detention is the result of an intent to punish on the United States' part.  Further,
the Court determines that "facilitating deportation" is a rational, nonpunitive purpose for detention.
Demore v. Kim, 538 U.S. at 532-33 (Kennedy, J., concurring).  Finally, the Court determines that
Singh's detention to date, detained since September 4, 2025, is not so long so as to qualify as
"excessive in relation" to the purpose of facilitating deportation.  See PFRD at 2.  When there is
"an unreasonable delay by the INS in pursing and completing deportation proceedings, it could
become necessary then to inquire whether the detention is not to facilitate deportation . . . but to

incarcerate for other reasons." <u>Demore v. Kim</u>, 538 U.S. at 532-33 (Kennedy, J, concurring). The Court does not draw a bright-line rule of what constitutes an "unreasonable delay," but concludes that the approximate four-month detention up to this point does not constitute a violation of Singh's substantive due process rights, especially given the fact that his final preliminary hearing occurs on January 20, 2026, after which Singh will be scheduled for a final determination on his asylum application. Accordingly, the Court sustains the Federal Respondents' Objection to Magistrate Judge Khalsa's conclusion in the TRO PFRD that Singh's detention violates Singh's Fifth Amendment due process rights. The Court denies Singh's habeas petition without prejudice, however, and gives him the opportunity to refile should his detention extend to a length of time sufficient to cross over to punishment and violate his substantive due process rights.

### III. THE COURT SUSTAINS THE RESPONDENTS' OBJECTION TO MAGISTRATE JUDGE KHALSA'S CONCLUSION IN THE TRO PFRD THAT IF THE COURT ELECTS TO ORDER A BOND HEARING UNDER § 1226(a), THE UNITED STATES BEARS THE BURDEN OF PROVING BY CLEAR-AND-CONVINCING EVIDENCE THAT CIRCUMSTANCES HAVE CHANGED SUCH THAT SINGH IS NOW A FLIGHT RISK OR <u>A DANGER TO PERSONS OR PROPERTY</u>.

The Respondents object to Magistrate Judge Khalsa ordering a bond hearing and, at that hearing, requiring the burden of proof to shift to the United States to prove by clear-and-convincing evidence that the circumstances have changed such that Singh is now a flight risk or a danger to persons or property. <u>See</u> Objections to the TRO PFRD at 6-7. The Court need not decide what the bond hearing should look like, because it is not ordering the bond hearing. Accordingly, the Court sustains the Respondents' Objection, in so far as there will be no bond hearing at which the burden shifting can occur.

### IV. THE COURT SUSTAINS THE RESPONDENT'S OBJECTION TO MAGISTRATE JUDGE KHALSA'S CONCLUSION IN THE HABEAS PETITION PFRD THAT SINGH MAY FILE <u>A MOTION FOR FEES UNDER THE EAJA, 28 U.S.C. § 2412(d)(1)(A)</u>.

The Respondents argue that the Court should not permit Singh to file a motion for fees under the EAJA because, among other arguments, he is not the "prevailing party" in this case. Objections to the Habeas Petition PFRD at 6. The Court agrees with the Respondents' arguments. Singh is not the prevailing party to this case, because the Court denies his habeas petition in full. Accordingly, because the EAJA affords fees and other expenses only to private parties who prevail in litigation against the United States if, among other conditions, the United States' position is not "substantially justified," the Court sustains the Respondents' Objection to Magistrate Judge Khalsa's conclusion that Singh may file an EAJA motion for fees. See Comm'r, I.N.S. v. Jean, 496 U.S. 154, 155 (1990); 28 U.S.C. § 2412(d)(1)(A).

**IT IS ORDERED** that (i) the Federal Respondents' Objections to the Proposed Findings and Recommended Disposition, filed December 4, 2025 (Doc. 18) are sustained; (ii) the Federal Respondents' Objections to the Proposed Findings and Recommended Disposition, filed January 13, 2026 are sustained; (iii) the Magistrate Judge Proposed Findings and Recommended Disposition, filed November 21, 2025 (Doc. 14)("TRO PFRD") is rejected; (iv) the Magistrate Judge Proposed Findings and Recommended Disposition, filed December 31, 2025 (Doc. 20)("Habeas Petition PFRD") is rejected; and (iv) the Petitioner's Verified Petition Under 28 U.S.C. § 2241 for a Writ of Habeas Corpus (Doc. 1), is denied without prejudice; (vi) the Court sustains the Federal Respondents' Objections, and a separate Final Judgment will be entered.

_____
UNITED STATES DISTRICT JUDGE

*Counsel and parties:*

Lance Curtright
Alejandra Martinez
De Mott, Curtright, & Armendariz, LLP
San Antonio, Texas

   *Attorneys for the Petitioner*

Todd Blanche
  Deputy Attorney General
United States Department of Justice
Washington, D.C.

--and--

Ryan Ellison
   Acting United States Attorney
Jean Margaret Trenbeath
  Assistant United States Attorney
United States Attorneys Office
Albuquerque, New Mexico

   *Attorneys for Respondents Kristi Noem, Pamela Bondi, Todd M. Lyons, Mary De Anda-Ybarra*

Dora Castro

   *Defendant*